(February 8, 1897.)

## STATE OF IDAHO v. CRUMP.

[47 Pac. 814.]

DISCRETION OF TRIAL COURT IN DISCHARGING JURY.—The trial court discharged the jury in the first trial after they had been out fifteen and one-half hours, without the consent of the defendant. *Held*, that it was not error, but in the discretion of the court under section 7905 of the Revised Statutes.

ASSISTANT COUNSEL FOR PROSECUTION.—It was not error for the court to appoint assistant counsel for the prosecution; such counsel having been employed by the county commissioners.

EVIDENCE—WHEN NOT ADMISSIBLE.—A statement made by a defendant while under arrest and in jail in charge of his accuser, and not connecting said defendant with the alleged crime, is not admissible in evidence. So decided by this court in *State v. Mason*, 4 Idaho, 543, 43 Pac. 63.

(Syllabus by the court.)

APPEAL from District Court, Washington County.

Lot L. Feltham, for Appellant.

In capital cases the court has no power, without the consent of the prisoner, to discharge the jury because they have not agreed and declare they never can agree upon a verdict. (*Commonwealth v. Cook*, 6 Serg. & R. (Pa.) 577, 9 Am. Dec. 465; *McCreary v. Commonwealth*, 29 Pa. St. 325; *O'Brian v. Commonwealth*, 9 Bush (Ky.), 339, 15 Am. Rep. 715; *People v. Cage*, 48 Cal. 323, 17 Am. Rep. 436; *Commonwealth v. Fitzpatrick*, 121 Pa. St. 115, 6 Am. St. Rep. 757, 15 Atl. 466.) The court erred in admitting in evidence, over defendant's objection, the deposition of Charles R. Eldredge, the state not having shown due diligence in securing his attendance at the trial, and defendant not having been permitted the privilege of cross-examination at the time the deposition was taken. (1 Greenleaf on Evidence, sec. 440; *People v. Stock*, 1 Idaho, 222; *Territory v. Evans*, 2 Idaho, 658, 658, 23 Pac. 115; *Territory v. Chavez*, 8 N. Mex. 528, 45 Pac. 1108.) The court erred in admitting in evidence, over the objection of defendant, the statement signed by defendant and marked exhibit 1, it being shown that the statement was made by defendant upon the advice and counsel

of George W. Edwards, deputy sheriff, and Charles B. Eldredge, jailer, and was made while defendant was confined in jail, was sick, alarmed and excited, and was in great bodily fear of mob violence, and for the further reason that the statement was not a confession by defendant of the offense charged, but was an accusation of another person. (1 Greenleaf on Evidence, sec. 219, note a, sec. 220, note a, sec. 222; *State v. Mason,* 4 Idaho, 543, 43 Pac. 63; *People v. Barrie,* 49 Cal. 345; *People v. Thompson,* 84 Cal. 598, 24 Pac. 386; *Nolen v. State,* 14 Tex. App. 474, 46 Am. Rep. 247, and note; *Barnes v. State,* 36 Tex. 356; *Redd v. State,* 69 Ala. 255; *Brown v. People,* 91 Ill. 506; *State v. Jones,* 54 Mo. 478; *People v. Mondon,* 103 N. Y. 211, 57 Am. Rep. 709, 8 N. E. 496; *State v. Wintzingerode,* 9 Or. 153; 1 Bishop on Criminal Procedure, secs. 1232-1236.) The element of kindness in defendant's character was a matter of clear uncontradicted proof in the evidence, and an important element in the case. Omitting the word "kindness" from the instructions was a misconstruction of the evidence, and tended to mislead the jury. (1 Greenleaf on Evidence, sec. 54, note 3; *People v. Dogget,* 62 Cal. 27.)

R. E. McFarland, Attorney General, and Hawley & Puckett, for the State.

The court in its discretion may order a jury discharged when it appears there is no reasonable probability of an agreement, and such discharge implies that the defendant will be tried anew. (Rev. Stats., secs. 7905, 7906; *People v. Stock,* 1 Idaho, 218; *People v. Harding,* 53 Mich. 48, 487, 51 Am. Rep. 95, 18 N. W. 555, 19 N. W. 155; *People v. Shotwell,* 27 Cal. 394; *Ex parte McLaughlin,* 41 Cal. 211, 10 Am. Rep. 272; *United States v. Perez,* 9 Wheat. 580; *People v. Green,* 13 Wend. 57; *People v. Goodwin,* 18 Johns. 200, 9 Am. Dec. 203.) The statute, as well as the decisions of this court, countenance the employment of special counsel in criminal cases. (Rev. Stats. sec. 7855; *State v. Hurst,* 4 Idaho, 345, 39 Pac. 554.) Depositions taken before a committing magistrate may be used at the trial, if the attendance of the witness cannot be procured. (*Territory v. Evans,* 2 Idaho, 651, 23 Pac. 232.) If the statement is made by a party under arrest voluntarily and without

any threats or promises of reward, it is admissible.  (*People v. Rodundo,* 44 Cal. 538; *People v. Long,* 43 Cal. 444; *People v. Ramirez,* 56 Cal. 533, 38 Am. Rep. 73; Rice on Criminal Evidence, 490; *Territory v. McKern,* 3 Idaho, 15, 26 Pac. 123.) The time at which threats were uttered goes not to the admissibility, but to the weight to be given.  (*Cribbs v. State,* 86 Ala. 613, 6 South. 109.)  The remoteness makes no difference as to their competency.  (*Keener v. State,* 18 Ga. 194, 63 Am. Dec. 269; *White v. Territory,* 3 Wash. Ter. 397, 19 Pac. 37; *People v. Brown,* 76 Cal. 573, 18 Pac. 678; *Griffin v. State,* 90 Ala. 599, 8 South. 670.)  Instruction No. 11 given by the court correctly states the law.  (Sackett on Instructions, 641; Roscoe's Criminal Evidence, 55; *Connor v. State,* 34 Tex. 659; *Riley v. State,* 4 Tex. App. 538; *State v. Hollenscheit,* 61 Mo. 302.)  Instruction No. 14, as given by the court, is a correct interpretation of the law.  (Rice on Criminal Evidence, 446, 447, and authorities cited.)

HUSTON, J.—The defendant was informed against for the murder of Thomas Ronan.  A trial was had on May 12, 1896, upon which trial the case was submitted to the jury at 11 o'clock P. M. on the 16th of May, and at half past 2 o'clock P. M. of the following day the jury was discharged by the court, they having failed to agree upon a verdict.  On May 21, 1896, another jury was impaneled, and another trial was had, resulting in a verdict against the defendant of guilty of murder in the second degree, with two special verdicts in favor of the state upon defendant's two special pleas of "former acquittal" and "once in jeopardy," interposed by defendant upon said second trial.  The facts in regard to the homicide are briefly as follows: The deceased, Thomas Ronan, was a farmer residing in Canyon county, at Lower Boise, about eleven miles from the town of Caldwell, with his family, consisting of a wife and two children, of the respective ages of seven years and four years. On the evening of May 13, 1895, the deceased partook of his supper at half past 6 or near 7 o'clock, which consisted of fried beefsteak, fruit and bread.  Shortly after supper, deceased went to his field, to change the water (irrigating).  Returning, he lighted the lamp, and sat down to read the newspaper.  At

about 9 o'clock he called to his wife, who was in another room, that he heard a noise in the wire fence, and he would go down and see if horses were in the wire. Thereupon he drew on his boots, and went out. The next morning deceased was found dead about two hundred and fifty or three hundred yards from the house. There was a wound, apparently made by some blunt instrument, in his forehead, and two more of the same character upon the back of his head. There was no evidence of a struggle near where the body lay. No footprints were visible. The clover was eight or ten inches high where the body was found. A reward of $1,000 had been offered for the apprehension and conviction of the party or parties who committed the homicide. On the eleventh day of June, 1895, the defendant was arrested at the town of Payette, in Canyon county, upon the complaint of one Charles R. Eldridge, for the murder of said Thomas Ronan. The circumstances attending the arrest of the defendant were peculiar. It seems from the evidence that the defendant and Eldridge had been on a trip to Vale, Malheur county, Oregon, and, returning, had stopped at Payette.

Edwards, the deputy sheriff, who arrested Crump, states as follows: "It was between the hours of 6 and half past 6 on the eleventh day of June, 1895, Mr. Eldridge came to my residence in Payette, and asked me if I was the deputy sheriff. I told him I was, and he says, 'I want you to arrest a man for the murder of Ronan.' I asked him his name, and he told me it was Matt Crump. I asked him what ground he had for suspecting this man for the killing of Ronan. He said, as he was riding from Riverside to Vale, Oregon, that Matt Crump told him that he killed Tom Ronan. I told him I would go in and finish my supper, and come down after supper, and arrest him. He told me he would go and get his supper over at the restaurant. I told him I would see him down in front of the postoffice in Payette. As I went down, Eldridge and Crump came out of the restaurant. He came over to me, and gave me an introduction to him. I told him, says I: 'You look like the man I am looking for. I am going to arrest you for the murder of Thomas Ronan.' The defendant did not say nothing whatever. He did not deny it or say anything at all about it. I took my handcuffs out of my pocket, and put them on him, and, as I put them

on him he commenced to sweat. I thought the man was sick. The sweat dropped actually from his face as thick as small-sized shot. The man was sick. I asked him if he was sick, and he said he drunk a couple of glasses of beer over to Ontario, and it was very warm, and he did not feel well. I took him down to the jail, and sent Eldridge to get a bucket of water. This was C. R. Eldridge, the man who was afterward a witness in this case. The defendant never said nothing to me in regard to the charge, or in answer to my statement that I arrested him for the Ronan murder. After Eldridge went for the bucket of water, defendant asked me if that fellow gave him away, meaning Eldridge. I asked him, 'Who?' He says, 'Eldridge.' Says I, 'What for did you commit the murder?' He says, 'No; that's for me to say.' I told Eldridge to go and swear out a complaint. Eldridge went up, and swore out a complaint, and got a warrant for Mr. Crump. I arrested Crump and took him before Justice Allen. The justice set his trial for the next day. I took him back to the jail again. It might be half an hour after that I stopped at the jail. I went up home, and got some supper, at about half past 11. I gave Eldridge the keys of the outside door, and took the keys of the inside door of the jail. Before I went up to get my supper, Crump sung out for Eldridge and I told Eldridge to go in and see what he wanted. I gave him the key of the right-hand cell, which Crump was in. The left-hand cell was open, and I went into the left-hand cell. Crump did not know I was in the left-hand cell. Eldridge unlocked the cell door. Crump says: 'Charley, what did you give me away for?' Eldridge said: 'I had to, Matt; such a cold-blooded crime demanded me to do it.' He says: 'I wouldn't do that to you.' I told Eldridge to come out of the cell; that was talk enough. I went out, locked the outside door and told Crump that I was going up to get something to eat. Says he, 'For God's sake, sheriff, don't leave the jail.' Says I, 'Why?' Says he, 'Those people there on the Boise river will come over and hang me.' Says I, 'You did not kill Tom Ronan, did you?' Says he, 'No; but they told me right there, in my presence, in Boise Valley, that they would hang the man to a telegraph pole that killed Tom Ronan.' Says I, 'I am not going to leave the jail only to get a bite to eat. Mr. Eldridge

will come up for me if you want anything before I come back.'
When I went up to get something to eat, it was half past 11, I
judge.  I was up to my place about twenty minutes when El-
dridge came up.  Says he, 'Crump wants to see you down to the
jail.'  Eldridge said Crump wanted me to bring a pencil and
paper and law book.  I went; asked Crump what he wanted of
me.  He said, 'I want to make a statement.'  Says I, 'Did you
kill Tom Ronan?'  Says he, 'No; but I know who did.'  Says
I, 'Who did?'  Says he, 'Mrs. Ronan killed him.'  Says, 'I
want to make a statement.'  'Well,' says I, 'I will take your
statement down, but you make it of your own free will.'  He
says, 'All right.' "  The deputy sheriff then took down the fol-
lowing statement, as the same was dictated by defendant, in
the presence of said deputy and said Eldridge; and after the
same had been read over to defendant, and signed by him, two
persons, Banks and Dempsey, were called in, and signed as wit-
nesses:

## "The Statement of Matt Crump.

"Payette, Canyon Co., State of Idaho.  Matt Crump do
somely swear i seen Mrs. Ronan strike Thomas Ronan with
a ax on the head at half past seven o'clock at night, Monday
evening, 13th day of May, 1895.  Mrs. Ronan struck him three
times on the back of is head and on the foured.  She turned
him over to hit him on the foured.  i Mat Crump was stand-
ing 25 feet from the place he was murdered.  Mrs. Ronan
wanted me three weeks before Thomas Ronan was murdered,
wanted me to kill him because they had truble.  i told Mrs.
Ronan i would not do it.  And she said she would do it her
self if she couldn't get any one to do it.  Mrs. Ronan had on
man clouths when she murdered Toms Ronan.  Mrs. Ronan
whas trying to mimick me Mat Crump when she kiled him her
husband.  When i Mat Crump rod up to the stable to take my
sadle off my horse, I seen her gooin from the shead to the
house.  Mrs. Ronan told him their was A horse in the wire
fence.  She went down to the crewell with the ax in her hand
and Mr. Ronan went down after Mrs. Ronan did and i Matt
Crump started down to the crewell, and when i Matt Crump
got very near down to where Mr. Ronan was murdered, I seen

her hit Mr. Ronan witt the ax on the back of his head and knock him down. i Matt Crump left my cloths up stairs and Mrs. Ronan got them and put them on to kill Mr. Ronan. Mrs. Ronan sad has she part me to go to the house after she kill Mr. Ronan for God Sake not to tell it. i Matt Crump told her Mrs. Ronan if i was tolled on i would tell it.

                               "MATT CRUMP.

"Subscribed and sworn to before me this 11th day of June, 1895.                      D. D. CAMPBELL,
                                             "Sheriff.
                     "By George William Edwards,
                                   "Deputy Sheriff.
"Witness:
                 "C. R. ELDRIDGE.
                 "J. R. BANKS.
                 "W. R. DEMSEY."

Continuing, the witness Edwards says: "It was about twelve to fifteen minutes after 12 o'clock when the statement was signed and witnessed." Upon his cross-examination, the witness Edwards varies his testimony somewhat. It would appear from the statement made by Edwards in his deposition at the preliminary examination that Crump said to Eldridge, when the latter came into the cell after defendant's arrest: "Charley [meaning Eldridge], I see I am wrong." The deputy sheriff, upon cross-examination, admits that, after he had employed Eldridge to watch the jail and look after defendant, Eldridge, in the presence of the deputy sheriff, said to Crump, the defendant, "If you know anything about it, the best thing you can do is to tell it"; and soon thereafter the deputy went to his house to get something to eat, and in about twenty minutes the man Eldridge came for him, and he went to the jail, when the statement of defendant was taken.

Upon the preliminary examination, the man Eldridge deposes as follows:

"My name is Charles Eldridge. Reside at Lower Boise, Idaho. Am a cabinet maker by occupation. Q. Are you acquainted with the defendant, Matt Crump? A. Yes, sir.

Q. Were you with the defendant, Matt Crump, in the month of June, 1895? A. Yes, sir. Q. State where and when. A. On the 11th day of June, I made a trip with Mr. Crump, Lower Boise Valley to Vale, Oregon. Q. Did you have any conversation with Mr. Crump on that trip with reference to the Ronan murder. A. Yes, sir. Q. State what he said to you in reference to the murder of Thomas Ronan. A. Matt Crump told me that he killed Tom Ronan."

"Cross-examination: Q. Where was this? A. While riding from Riverside Ferry to Vale, Oregon. Q. Were you not present at the jail in Payette, Idaho, June 11, 1895, at the time Matt Crump signed the statement relative to the Ronan murder? A. Yes, sir. Q. Were you not a witness to that signature? A. Yes, sir. Q. Did you make any protest against him signing it? A. No, sir. Q. Did he sign it at your request? A. No, sir. Q. How long have you lived in Canyon county? A. On and off for five or six years. Q. Where have you lived during that time that you were not here? A. Lived in Oregon some. Q. At what place in Oregon? (Objected to that line of procedure by the court. Defense says that 'this cross-examination is proposed for the purpose of testing the credibility of the witness, and to show that he is a man that is not entitled—whose evidence is not entitled—to consideration; that is, my information that this witness has not resided in any community in the last seven years long enough to build or establish a reputation for the truth and veracity or otherwise, and that the only methods we have of establishing his reputation is from his own lips.' Overruled.)          C. R. ELDRIDGE.

"Subscribed and sworn to before me, this July 30, 1895.
                    "T. H. CALLOWAY,
                    "Justice of the Peace.

"Plaintiff's Exhibit Y. Filed this 26th May, 1896. I. F. Smith, Clerk."

It is conceded by the state that, upon the trial, Eldridge was clearly impeached. Moreover, almost immediately after making said deposition, he left the country, and has not since been seen or heard from. The testimony of the deputy sheriff and the statement of defendant, if admissible, are therefore the only evi-

dence in the case tending to connect the defendant with the homicide.

James Alexander testifies that he resides about nine miles from Caldwell, and about two miles from the Ronan place; that on the night of the 13th of May, 1895, the night of the homicide, at about 10 o'clock, and after he had gone to bed, he heard a horse go over a small bridge in the road, which he says he recognized as the horse usually ridden by defendant. Witness says his house is about fifty-five or sixty yards from the bridge referred to, at least not over one hundred yards, and that the bridge is about fourteen to sixteen feet long. The wife of this witness testifies to substantially the same thing.

For the purpose of showing a motive for the homicide on the part of the defendant, the state introduced a witness, Roscoe Madden, who testified that, some time in February preceding the homicide, he was returning from a dance in company with defendant, and that, in the course of conversation relating to the neighbors, defendant stated that he had a score against Ronan for getting the best of his (Crump's) father in some deal about hay or some other produce, and that he (defendant) would fix Ronan. This was some three months prior to the homicide, and during a large portion of the intervening time defendant had been working for deceased, and Mrs. Ronan states that they were on perfectly friendly terms. Witnesses on the part of the state testify that, on the night of the homicide, defendant was at Caldwell, eleven miles from the place of the homicide, and that he left Caldwell at half past 9 o'clock. Another witness on the part of the state, a near neighbor of deceased, testifies that, on the evening of the homicide, himself and another were engaged in repairing or putting up a hayrack; that, about half past 9 o'clock on said evening, they heard deceased "hissing dogs onto his stock," at his place. The wife of deceased testifies that it was about 9 o'clock that deceased went out of the house to ascertain the cause of the disturbance, as he stated, at the wire fence.

Dr. E. E. Maxey states that he made an examination of the contents of the stomach of deceased; that such examination was made some ten days after the burial of deceased. The witness states, as a result of his examination of the stomach of deceased

and its contents, that, in his opinion, it must have been at least four hours after he had eaten his supper that deceased met his death. The testimony upon this subject, when viewed in the light of the circumstances under which the examination was made, the time when it was made and the character of the examination, and the further facts that the conclusions of the witness are scarcely in accord with the standard authorities upon the subject, is not, in our view, very satisfactory. The witness Smith, on the part of the state, states that defendant came to his house on the night of the 13th of May; that he asked defendant what time it was, and defendant replied that it was 11 o'clock. Witness did not look to see what time it was. Smith's place is about four miles from Caldwell, and about seven miles from the house of deceased.

The first error specified by appellant is as to the action of the trial court in discharging the jury upon the first trial, after they had been out but fifteen and one-half hours, without the consent of the defendant. We do not think there was an abuse of discretion by the trial court in this matter. The court is authorized to discharge the jury when, "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (Idaho Rev. Stats., sec. 7905.) The trial court must be better qualified to judge as to what is "a proper time," as well as to the probability of an agreement by the jury, than this court; and, except in a case where the record shows a palpaable abuse of discretion, we think the action of the lower court should r t be disturbed.

The next error charged is the action of the court in appointing assistant counsel for the state. The counsel, it appears, in this case, had been employed by the commissioners of Canyon county, and we do not think their appointment by the court, in compliance with such employment, was error.

We find no error in the action of the court upon the pleas of "former acquittal" and "once in jeopardy."

The circumstances under which the "statement," so called, of the defendant, was procured, were such as should have precluded its admission as evidence. The facts are almost identical with those in the case of *State v. Mason,* 4 Idaho, 543, 43 Pac. 63.

decided by this court in December, 1895. As before stated, the state conceded on the argument that the witness Eldridge was clearly impeached, and the record so shows. Now, when we eliminate the statement of the defendant and the testimony of Eldridge from the case, what have we left except the desultory talk of the defendant, both before and after the homicide, and which is as consistent with his innocence as guilt? The evidence shows that the defendant was in Caldwell, eleven miles from the scene of the homicide at half past 9 o'clock in the evening, and that he was at Mr. Smith's house at 11 o'clock. This would require, to support the theory of guilt, that defendant must have gone a distance of eighteen miles between half past 9 and 11 o'clock, an hour and a half, and committed the homicide in the meantime. Very improbable, at the best. The record fails to disclose any motive whatever on the part of the defendant for the commission of the crime. Up to the very day Ronan was killed, he and defendant had been and were upon the best of terms. The theory hinted or rather squinted at in the record, that there were suspicious relations between defendant and the wife of deceased, is entirely unsupported. In fact, the whole course of conduct of defendant is averse to any such theory. Many exceptions are taken to the admission of testimony.

It was palpable error to admit testimony of the conversation between witness Peterson and deceased in regard to the ax, as it was in no possible way connected with defendant, and only served to build up the mass of suspicions and inferences upon which alone it is evident the jury acted. Every witness put upon the stand in that behalf testified to the good character of the defendant for peaceableness, quiet and kindness. There are various theories deducible from the evidence in the case just as consistent with the innocence of the defendant as was that adopted by the jury with his guilt. The statement of Mrs. Ronan in regard to the tramp who visited their house about dark, and who, being somewhat rudely repulsed by deceased, went away grumbling, when taken with the peculiar circumstances of the killing, is a most suggestive fact.

Exception is taken by defendant to various instructions given

by the court, and to others asked by defendant, and refused by the court. We shall consider those we deem important.

Defendant excepts to the court's definition of a "reasonable doubt." This objection may reasonably be anticipated in every appeal from a conviction for murder. We see no grounds for objection to the definition of the court in this case; but we are convinced from a somewhat lengthy experience that the introduction of this idea or theory of a "reasonable doubt" into the administration of the criminal law has done more to protect criminals, and enable them to escape just punishment than even that other heresy, that "it is better that fifty guilty men should escape than that one innocent man should suffer." Take the case under consideration: If the defendant killed the deceased, he was guilty of murder in the first degree, beyond question or peradventure. Why, then, the verdict of murder in the second degree? Under the instructions of the court, if the jury found the defendant did the killing of deceased, there was but one thing for them to do, under their oaths. It is palpable that they availed themselves, as a sedative to their consciences, of that reasonable doubt which, had they followed the instructions of the court, would have wrought the acquittal of the defendant. Instruction No. 11, as given by the court, was erroneous, as the "statement" of the defendant and the testimony of the witness Eldridge, upon which the instruction is based, should never have been admitted in evidence; and the same may be said of instructions Nos. 12 and 13.

Instruction No. 14 excepted to by defendant: We think this instruction erroneous. The rule laid down by the trial court in regard to the importance of proving motive in cases where the evidence is entirely circumstantial, as it is in this case, is not the correct rule, nor is it that stated in Rice, whom the court cites. At page 446 of 3 Rice on Evidence, quoting from the opinion of Church, C. J., in *People v. Bennett*, 49 N. Y. 137, he says: "It is in cases of proof by circumstantial evidence that the motive often becomes not only material, but controlling; and in such cases the fact from which it may be inferred must be proved. It cannot be imagined any more than any other circumstance in the case." It is apparent from the statement of

what defendant said to the deputy sheriff, after he was arrested, that he (defendant) was in great fear of violence from a mob. The deputy sheriff testifies on his cross-examination that defendant said "that he was afraid the people of Boise Valley would find out that he was arrested, and come over and hang him." After the deputy had employed the man Eldridge to guard the jail and the prisoner, he goes away, leaving defendant under charge of Eldridge. In twenty or thirty minutes Eldridge goes for the deputy sheriff, telling him that Crump wanted him to come down to the jail, and bring pencil and paper, etc. When the deputy sheriff came to the jail, defendant made the statement hereinbefore set forth. That statement was made in the presence of Eldridge, and although directly contradictory of what Eldridge had previously declared defendant had stated to him, Eldridge made no comment upon it then, nor at the preliminary examination. As before said, the "statement," so called, of defendant, was made under circumstances which should have precluded its admission as evidence. As to the testimony of Eldridge, it requires no comment.

The conclusion is forced upon us, from a most careful and scrutinizing examination of the record, that there is not sufficient evidence in the record to warrant the conviction of the defendant. The judgment of the district court is reversed, and the cause remanded.

Sullivan, C. J., and Quarles, J., concur.