Points decided.

(June 15, 1898.)

## STATE v. DAVIS.

[53 Pac. 678.]

EVIDENCE—COMPETENT TO SHOW MOTIVE.—The defendant was a cattle-
man, the deceased a sheepman. The state was permitted, over
the objections of the defendant, to prove that the accused was
making war against sheepmen generally, and threatening the lives
of all sheepmen who failed to keep off a certain range; the de-
ceased, a sheepman, was killed on such range; and the circum-
stances pointed to the accused as the guilty party. *Held,* that
the evidence objected to was competent, as it tended to show mo-
tive on the part of the defendant.

SAME—OTHER CRIME—THREATS AGAINST A CLASS.—When the accused
was making war against a class of men (sheepherders) and threat-
ening to keep them off a certain range by use of deadly weapons,
and had made threats against sheepherders generally, and against
the person of the deceased, who was a sheepherder, it was com-
petent for the state to prove that two days before the homicide
the defendant had attacked, with such weapons, the camp of other
sheepherders, as such evidence tended to show the state of mind
of the defendant toward the deceased, and to establish motive on
his part to commit the crime.

SAME—COMPETENT TO SHOW ACCUSED FLED THE STATE.—It is compe-
tent, on a murder trial, to show that immediately after the com-
mission of the crime the defendant fled the state and was after-
ward arrested in another state, where he was going under an as-
sumed name.

ALIBI—WHAT MUST BE SHOWN.—The gist of the defense of *alibi* con-
sists in showing that at the time of the commission of the al-
leged crime the defendant was at a place different from that where
the crime was committed.

CONFESSION BY AN ACCUSED.—A confession, or declaration tending to
show guilt made by an accused while under arrest, of his own
volition, and without any threat or promise or inducement having
been made or held out to him by such officer or other person pres-
ent, is competent evidence on the trial of a criminal case.

NEW TRIAL—WHEN SHOULD NOT BE GRANTED.—A new trial should not
be granted on the ground of newly discovered evidence where such
evidence is merely cumulative, or where it was within the power
of the defendant, by the use of reasonable diligence, to have pro-
duced such evidence on the trial.

SAME—GROUND FOR NEW TRIAL, SECTION 7952, REVISED STATUTES.—
If it be a ground for new trial, under section 7952 of the Revised

Statutes, that a juror, prior to the trial, expressed an opinion that the defendant is guilty, which is doubted, one or two *ex parte* affidavits are not sufficient to overcome the positive statement of such juror, made on his *voir dire* examination, that he has no opinion, and has never formed or expressed an opinion, as to the guilt or innocence of the accused, and such juror is shown to have a good reputation for truth and veracity among his neighbors and acquaintances.

SAME—GROUNDS STATUTORY.—The grounds for a new trial are statutory and cannot be extended by the courts by rule.

(Syllabus by the court.)

APPEAL from District Court, Cassia County.

Hawley & Puckett and K. I. Perky, for Appellant.

In cases of circumstantial evidence the rule is, that not only must the proof be consistent with the prisoner's guilt, but must be consistent with every other rational conclusion. (*People v. Strong,* 30 Cal. 151; *People v. Schuler,* 28 Cal. 490; 1 Greenleaf on Evidence, 12th ed., sec. 34; 1 Starkie on Evidence, 181, 182.) Evidence of a prior crime can have no legitimate place in the investigation of the commission of a subsequent crime by the same person. (*People v. Sharp,* 107 N. Y. 427; 1 Am. St. Rep. 851, 14 N. E. Rep. 319.) In an indictment for murder committed during a riot, in which the prisoner was engaged, it is incompetent to prove other riotous acts by him several hours earlier at a different place, unless it is first shown that those acts were all part of one transaction. (*Commonwealth v. Campbell,* 7 Allen, 541, 83 Am. Dec. 705; *People v. Lane,* 100 Cal. 379, 34 Pac. 856; *Shaffner v. Commonwealth,* 72 Pa. St. 60, 13 Am. Rep. 649; *Chipman v. People,* 24 Colo. 520, 52 Pac. 677; *Farris v. People,* 129 Ill. 129, 16 Am. St. Rep. 283, 21 N. E. 821; *State v. Lapage,* 57 N. H. 245, 24 Am. Rep. 69; *Boyd v. United States,* 142 U. S. 450, 12 Sup. Ct. Rep. 292; *Hall v. United States,* 150 U. S. 76, 14 Sup. Ct. Rep. 22; *State v. Reavis,* 71 Mo. 421; *Brook v. State,* 26 Ala. 106.) The general rule, as we understand it, is, that on an indictment for murder, proof of previous threats made by the defendant against the deceased, is competent as showing malice, and if made long enough before the homicide, as evidence of premeditation and deliberation. (9 Am. & Eng. Ency. of Law, 686, note 1.)

But, however, if in making a threat it is directed toward a certain individual or individuals, specifying them, they are not admissible upon the trial of defendant for killing another person. (*Carr v. State*, 23 Neb. 749, 37 N. W. 630; *Aberbathy v. Commonwealth*, 101 Pa. St. 322; 9 Am. & Eng. Ency. of Law, 687; *Clark v. State*, 78 Ala. 474, 56 Am. Rep. 45; *People v. Bezy*, 67 Cal. 223, 7 Pac. 643.) We have alleged as an error the admission of the testimony of E. R. Dayley in regard to conversations with defendant while on the road to Albion from Arizona; and while defendant was under arrest and partially in the custody of the witness. This conversation was clearly improper under the general rules of law and the rulings of our supreme court. (*State v. Crump*, 5 Idaho, 166, 47 Pac. 814; *State v. Mason*, 4 Idaho, 543, 43 Pac. 63.) Where a party has examined a juror as to his qualification, and the juror does not answer truly, it is manifest that the party is deprived of his right of challenge for cause, and deceived into foregoing his right of peremptory challenge. Therefore, when such a state of facts is proven, a new trial will be granted. (*Rusich v. State*, 19 Ohio, 798; *Rice v. State*, 10 Ind. 300; *Wiggin v. Plummer*, 31 N. H. 272; *State v. Burnside*, 37 Mo. 347; *United States v. Upman*, 2 Mont. 170; *Territory v. Kennedy*, 3 Mont. 520.) The misconduct of a juror is more closely scrutinized, and more nearly affects the verdict in a criminal than in a civil case. (*Morrow v. Commissioners*, 21 Kan. 484; *Queen etc. v. Hepburn*, 7 Cranch, 297 (decision by Chief Justice Marshall); *Monroe v. Georgia*, 5 Ga. 85.)

Attorney General R. E. McFarland, W. E. Borah and O. W. Powers, for the State.

The fact that a juror after trial is found to have formed or expressed an opinion before going on the jury is not ground for a new trial under our statute. (Idaho Rev. Stats., sec. 7952; *People v. Mortimer*, 46 Cal. 114-121; *People v. Samsels*, 66 Cal. 99, 4 Pac. 1061; *State v. Marks*, 15 Nev. 33; *State v. Gyle*, 8 Wash. 12, 35 Pac. 417; *Spies v. People* (The Anarchist Case), 122 Ill. 1, 3 Am. St. Rep. 320, 12 N. E. 867, 992, 993, 17 N. E. 898; *State v. Peterson*, 38 Kan. 204, 16 Pac. 264; *Hughes*

*v. People,* 116 Ill. 330, 6 N. E. 55; *State v. Brookes,* 92 Mo. 542, 5 S. W. 257; *Territory v. Burgess,* 8 Mont. 57, 19 Pac. 558.) It is an established rule that newly discovered evidence on motion for a new trial is looked upon with distrust and disfavor by the courts. (*Baker v. Joseph,* 16 Cal. 180; *People v. Sutton,* 73 Cal. 243, 15 Pac. 86; *People v. Howard,* 74 Cal. 547, 16 Pac. 394; *People v. Freeman,* 92 Cal. 359, 28 Pac. 261-264; *Harralson v. Barrett,* 99 Cal. 607, 34 Pac. 342; *O'Brien v. Brady,* 23 Cal. 243; *Jones v. Singleton,* 45 Cal. 94; *Hoblar v. Cole,* 49 Cal. 250; *Arnold v. Skeggs,* 36 Cal. 54.) Newly discovered evidence which is merely cumulative or designed to contradict witnesses is not of a character to warrant a new trial. (*People v. Anthony,* 56 Cal. 397; *People v. Sutton,* 73 Cal. 243, 15 Pac. 86; *State v. Hardy,* 4 Idaho, 478, 42 Pac. 507; *People v. Fong Ah Sing,* 70 Cal. 8, 11 Pac. 324; *People v. Cesena,* 90 Cal. 381; 27 Pac. 300; *People v. Biles,* 2 Idaho, 114, 6 Pac. 120; *People v. Peacock,* 5 Utah, 237, 14 Pac. 332; *People v. Goldenson,* 76 Cal. 328, 19 Pac. 161.) A new trial will not be granted upon evidence that is in conflict with evidence given at the trial. (*People v. Freeman,* 92 Cal. 359, 28 Pac. 261; *People v. O'Neal,* 67 Cal. 378, 7 Pac. 790; *People v. Mazuley,* 45 Cal. 148.) Confessions under circumstances similar to those at bar have been admitted so often that it would be difficult to collate all the authorities upon the proposition. Our understanding is that the rule is well established. (*People v. Tie,* 32 Cal. 60; *People v. Smalling,* 94 Cal. 112, 29 Pac. 421; *People v. Goldenson,* 76 Cal. 328, 19 Pac. 161; *People v. Long,* 43 Cal. 444; *People v. Devine,* 46 Cal. 46.) Declarations and threats are admissible, not because they give rise to a presumption of law as to guilt, which they do not, but because from then, in connection with other circumstances, guilt may be logically inferred. (Wharton on Criminal Evidence, sec. 756; *State v. Hardy,* 4 Idaho, 478, 42 Pac. 507; *Hopkins v. Commonwealth,* 50 Pa. St. 9, 88 Am. Dec. 518; *Dixon v. State,* 13 Fla. 636; *Spies v. People,* 6 Am. Cr. Rep. 570.) It is true, as a general rule, that on a prosecution for one crime, it is not proper to prejudice the jury against the prisoner by showing him to have been guilty of another, but where the evidence is relevant and material on the question of

the guilt of the prisoner of the crime for which he is upon trial, it cannot be excluded merely because it also proves him guilty of another crime. (*Hope v. People*, 83 N. Y. 418, 38 Am. Rep. 460; *Kernan v. State*, 65 Md. 253, 14 Atl. 124; Wharton on Criminal Evidence, secs. 31, 32; *People v. Weed*, 56 N. Y. 628; *People v. Doyle*, 21 Mich. 227; Roscoe on Criminal Evidence, sec. 86; *State v. Cowell*, 12 Nev. 344; *Swan v. Commonwealth*, 4 Am. Cr. Rep. 189; *People v. Cummings*, 66 Cal. 668, 4 Pac. 1144, 6 Pac. 700, 846; *People v. Walters*, 98 Cal. 138, 32 Pac. 864.) It is proper in a criminal case to prove the commission by the accused of another and collateral crime, where such crime furnished a motive for the commission of the crime for which the accused is being tried. For the purpose of showing motive, the remoteness in point of time of the commission of the collateral crime cannot be considered. Syllabi. (*People v. Harris*, 136 N. Y. 423, 33 N. E. 65; *Moore v. United States*, 150 U. S. 57, 14 Sup. Ct. Rep. 26.) Insufficiency of evidence to justify the verdict. (*State v. Haverly*, 4 Idaho, 484, 42 Pac. 506; *State v. Larkins*, 5 Idaho, 200, 47 Pac. 945; *People v. Simpson*, 50 Cal. 304; *State v. Crozier*, 12 Nev. 300; *Palmer v. State*, 4 Neb. 68.)

QUARLES, J.—The appellant was, at the April term of the district court of the fourth judicial district, in and for Cassia county, tried upon the charge of murder, committed upon the person of one John C. Wilson, and convicted. Thereafter the appellant, whom we hereafter designate as the defendant, moved for a new trial, which was denied him. The defendant then took two appeals to this court—one from the judgment of conviction, and the other from the order denying him a new trial. These two appeals, by consent of both parties, were argued and submitted together, and we will consider both appeals together. On the hearing the defendant was ably represented by James H. Hawley, Esq., and K. I. Perky, Esq., and the state was ably represented by Messrs. O. W. Powers and W. E. Borah. (The attorney general made no oral argument.) The case has been carefully, fully, and ably briefed on both sides.

The application for a new trial was based upon the following grounds: "1. That the verdict was decided by means other than

a fair expression of opinion on the part of all the jurors; 2. That the court misdirected the jury in matters of law during the course of the trial; 3. That the court erred in decisions of questions of law arising during the course of the trial; 4. That the verdict is contrary to law; 5. That the verdict is contrary to the evidence; 6. That new evidence has been discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial."

The errors relied upon by the defendant are as follows: "1. Error in overruling motion for new trial upon the ground of the evidence being insufficient to justify the verdict, in the following particulars, to wit: (1) The evidence fails to show that defendant was present at the time of killing of the deceased or at the time deceased received his mortal wounds, or that defendant was an accessary or privy thereto; (2) That the evidence fails to show when deceased received his wounds resulting in his death, or when he died; (3) That the evidence shows that deceased received the wounds from which he died, and died, after the fourth day of February, 1896; (4) That the evidence shows that the defendant was not in the vicinity of the killing of deceased, or any place where it was possible for him to have been concerned in said killing, after the 4th day of February, 1896; (5) That the evidence shows that defendant could not have been at the place of killing on February 4, 1896, and could not have been guilty of the murder of deceased, by reason of the impossibility of his riding from the Brown ranch, at the time he was proved to have been there on that day, to the place of killing, and from there back to the Boar's Nest ranch, at the time that the evidence shows that he was at said place on said day; (6) That the evidence fails to show any motive on the part of defendant for killing deceased; (7) That the evidence fails to show any intention on the part of defendant to kill deceased, or any reason or object for said course on his part, and, further, fails to show that he knew deceased or his companion, or knew of his presence or whereabouts at the time of the killing; (8) That the evidence fails to show that deceased was murdered; that it fails to show a premeditated, deliberate, or malicious killing by defendant or anyone else; (9) That the evidence fails to show

the guilt of defendant beyond a reasonable doubt, or to show his guilt at all; (10) That the evidence fails to show that the defendant was in possession or had under his control any weapon such as would account for the fatal wound on deceased; (11) That the evidence, taken as, and considered as, threats, does not and did not refer to deceased or his companion, but to other persons not connected with either of them, and that there is no evidence of threats by defendant against deceased; (12) That the conversation testified to by witnesses as having taken place and been had with the defendant referred, not to the killing of Cummings and Wilson, but to other matters not connected therewith. 2. Error in permitting evidence of other offenses to wit, the shooting affray at Wilson's camp on the night of February 2, 1897, to be given in evidence. 3. Error in allowing witnesses to testify as to the conversations and alleged threats, and threatening and abusive language, of defendant in Shoshone Basin, during the summer and fall of 1896, and in refusing defendant's motions to strike out such conversations and statements. 4. Error in allowing in evidence conversations had between defendant and officers having him in custody, while on the road to Albion, after his arrest. 5. Error in allowing witness Perkins to give his opinion to jurors in regard to what vital parts of deceased were penetrated by the bullets that caused his death. 6. Error in allowing witness Dr. Story to state his opinion of the relative position of the parties when the fatal shot was fired. 7. Error in refusing to strike out the evidence of witness James Dunn, found in subdivision 5 of errors, folio 1167 of transcript. 8. Error in allowing the paper picked up at the camp of Wilson and Cummings to be introduced in evidence. 9. Error in allowing witness E. R. Daley to testify as to the place where he found defendant at the time of his arrest, and the name he was there known by. 10. Error in allowing exhibits Nos. 5 to 11, offered by the prosecution, to be put in evidence. 11. Error in refusing a new trial upon the ground of newly discovered evidence. 12. Error in refusing to grant a new trial to defendant upon the ground of misconduct of the jury. 13. Error in refusing a citation to Addie Gordon, and to compel her to testify as to conversations had by Juror George

W. Gray in her presence. 14. Error in refusing to strike plaintiff's affidavits from the files, and in allowing them to be read upon the hearing, upon motion for new trial. 15. Error in allowing the affidavits mentioned in bill of exceptions No. 3 to be used upon motion for new trial. 16. Error in overruling defendant's motion for new trial."

The first error assigned is not, in our opinion, sustained by the record. It is true that no eye-witness swore to the fact that the defendant was present at the time and place the homicide occurred; still all of the circumstances point to his presence, and also to the fact that he did the killing. The evidence shows that the deceased received his wounds on or about the fourth day of February, 1896, and died soon thereafter. The evidence shows motive and premeditated design on the part of the defendant to commit the homicide. The evidence tends to show that the deceased was killed on the morning of the 4th of February, 1896. The evidence shows that the deceased was killed by a 44-caliber shot, and it shows that, just before the homicide occurred, the defendant was shooting 44 cartridges from a 45-caliber pistol. The evidence shows that the deceased and his companion, Cummings, were sheepmen, engaged in herding sheep, and that defendant had repeatedly made threats against the lives of sheepmen; and that about the time of the killing the defendant, with another companion, Jack Gleason, were riding the range armed with Winchester rifles, revolvers, and dynamite.

While considering this first assignment of error, we deem it proper to point out the facts established by the evidence, showing the conditions that existed in the locality of the crime, and the conduct of the defendant before and after the homicide. Cassia county is a stock county, some of its residents being engaged in raising cattle, and others in raising sheep. Trouble arose between the cattlemen and the sheepmen, the former claiming that the sheepmen were trespassing upon the range which peculiarly belonged to them. After pointing out the conditions that existed counsel for the defendant in their brief, at page 11, says: "Disputes again arose, and considerable feeling developed between the various owners, during the year 1896,

and, although there were no serious outbreaks, the condition was such as to perhaps warrant the belief that irreconcilable conflict was on between the two classes of stockmen." The deceased, Wilson, with his companion, Cummings, were engaged in herding sheep on the range between Goose creek and Deep creek, near the dividing ridge, in the Shoshone Basin. On the morning of February 4, 1896, the deceased, Wilson, and Cummings, were seen at their camp about 8 o'clock of that morning, apparently preparing for breakfast. They were living in a covered wagon, containing a bed, stove, and cooking utensils, such as is commonly used by sheepherders. They had two dogs tied to the wheels of their wagon. Twelve days later, or February 16th, they were found dead in their wagon, both having been shot. The dogs were still tied to the wagon, and were poor and emaciated, and their sheep were scattered in bands in the vicinity. Some uncooked bread was in the stove. The condition of the bodies showed that they had been dead from ten days to two weeks. The body of Wilson was covered with an overcoat, that of Cummings was uncovered. Blood was found on the ground in front of the wagon, on the wagon tongue, on the front part of the wagon sheet, and in the wagon. Both Wilson and Cummings had been shot with 44-caliber bullets, and the face and arms of Wilson were powder burned. Apparently both were wounded, and Cummings had assisted Wilson to bed, and threw an overcoat over him. The locality of the wounds on the bodies pointed beyond question to the fact that they had been killed by a third party or parties. There was only one firearm about the wagon when the bodies were discovered—an old rifle, that had not been used since it was last cleaned. Wilson was shot in the back, and one shot had struck his chin, and entered his chest, and passed through his right lung, and through his liver. Cummings had been shot through the body, the bullet cutting his intestines. The condition of Cummings' body and the nature of his wounds tended to show that he had lived from one to twenty-four hours after the shooting. As many as four empty 44-cartridge shells were found near the wagon, in a direct line ranging from three to twenty feet from the wagon. The defendant had been from the 24th of July, 1895, in the employ

of a large cattle company, having large herds and a number of ranches in Cassia county, and cattle and interests and ranches across the Idaho line, in Nevada. During the summer and fall of 1895 the defendant had threatened different sheepmen, and had declared repeatedly that he would keep his sheepmen off of the range in Shoshone Basin west of the dividing ridge between Deep creek and Goose creek, and which was claimed by the cattle men. Defendant told James Dunn and Oliver Dunn that they could not go any farther on that range with their sheep; that, if they did, they would have to face a Winchester; that he was hired to protect the range, and he was not going to allow sheepmen on it. He threatened Hale's sheepherders, and told the two Dunns that if they were Hale's men there would be some fighting done. He told William Orr, a sheepman, that he was there to hold that range, and that he was going to do it; that he did not allow sheepmen to go on there at all; that the first time a sheepman came there, there would be some shooting done; that he was working for the honor of holding that range, and not for the money there was in it; that the ridge between Big creek and Goose creek was the dead line. Defendant told Jabez Durfee, in the fall of 1895, that he did not allow any sheep in that country, and that he would kill the next sheepherder who crossed the ridge between Big creek and Goose creek. Said that he was just wishing that Bill Tolman, a sheepman, would come over; that he would like to make a target of him. Defendant also told Durfee that he wanted John Wilson (the deceased) to move right out over the ridge, and that, if he did not, there would be trouble. Defendant told William Craner, late in the summer of 1895, that he was going to kill some one that summer, or that some one would kill him; that he would shoe his horse with rawhide, and that Jesus Christ could not track him. On November 16, 1895, defendant met said Tolman, who had never seen him before, and took a shot at him. It does not appear that the defendant was seen in that vicinity again until he appeared at the Middlestacks ranch, with Jack Gleason, on the twenty-seventh day of January, 1896, both armed with 38-caliber Winchester rifles, defendant with a 45-Colt's revolver, and Gleason with a 44-Colt's revolver. Both

were practicing shooting, and cleaned their guns. Defendant was out of 45-cartridges, and was shooting 44-cartridges out of his 45-revolver. Defendant and Gleason went from the Middlestacks ranch to the Boar's Nest ranch, where the evidence shows them to have been on the 30th of January. At the Middlestacks ranch the defendant was wearing a light-colored canvas hunting coat, which he exchanged for a dark-colored coat; the defendant remarking at the time that the hunting coat that he had been wearing was too light, and could be seen too easily in the dark at night. Defendant and Gleason stayed at the Middlestacks ranch one day, and then went to the Boar's Nest ranch. On February 1, 1896, defendant and Gleason appeared at the Brown ranch, where they appeared to have remained until the morning of February 4th, with the exception of a few hours of February 2d. On the afternoon of February 2d, about 1 or 2 o'clock, the defendant and Gleason left the Brown ranch, armed with Winchester rifles and revolvers, and were gone until about 10 o'clock that night, when they returned. Defendant and Gleason remained at the Brown ranch on February 3d, and left there about sun-up—a little earlier or a little later—on the morning of the 4th. They were next seen at the Boar's Nest ranch somewhere between 1 and 3 o'clock in the afternoon of February 4th, where they claimed to have eaten their dinner in the absence of C. D. Edwards, the then keeper in charge of said ranch. Edwards testified that he ate dinner at the San Jacinto ranch that day, and returned to the Boar's Nest, and found defendant and Gleason. At the preliminary examination Edwards stated that defendant and Gleason were at the Boar's Nest ranch when he returned, about 2 or 3 o'clock. On the trial he stated it was 1 or 2 o'clock—nearer 1 than 2, he thought. From the Boar's Nest ranch the defendant and Gleason went to the Middlestacks ranch on the afternoon of February 4th, where they stayed all night. There defendant returned the dark-colored coat that he had been wearing, and received back the canvas hunting coat which could be seen too far at night. The said ranches all belong to the cattle company for which defendant and Gleason were working. There is some conflict in the evidence as to the exact distance

between the points named, but the evidence shows the distances that are material to be as follows: From the Middlestacks ranch to the Boar's Nest, ten or twelve miles; from the Boar's Nest to Brown ranch, about eighteen miles; from the Brown ranch to the place of killing, from fifteen to eighteen miles; from the place of killing to the Boar's Nest ranch, from fifteen to twenty miles. One witness, C. D. Edwards, stated that the distance from the place of killing to the Boar's Nest was about fifteen miles. All of . the points named are in Nevada, except the Brown ranch and the place where the homicide occurred, which are in Cassia county, Idaho. The evidence shows that the defendant and his companion, Gleason, were in the vicinity where the homicide occurred for seven or eight days; that they were feeding grain to their horses; that they were endeavoring to keep their presence in that vicinity known as little as possible, and then only to employees of the cattle company for whom they were working.

The evidence tends to show that the defendant and Gleason deliberately planned the murder of Wilson and Cummings, and that in so doing they were preparing to rely upon the defense of an alibi if charged with the crime, and the declarations of the defendant to the effect that he could prove an alibi strengthens and confirms this theory. The declarations and threats made by defendant against sheepmen generally, and the actions of defendant and Gleason, with all of the surrounding circumstances, point to them as the party or persons who attacked the Dunn sheep camp on the night of February 2, 1896; and the defendant admitted that he and Gleason were the parties who made that attack, but he claimed the honor of doing all of the shooting that was done by the attacking party. The circumstances, and actions of the defendant and Gleason, point to them, beyond any reasonable doubt, as the parties who attacked the camp of Wilson and Cummings on the morning of the 4th of February. After that the defendant told George Porter, a merchant at Deeth, Nevada, that he "is getting forty dollars a month for shooting sheepherders." Defendant remained away from Idaho until his arrest, but was at the Middlestacks ranch on the eighteenth day of February, when he told Frank Smith

about the attack on the Dunn camp. Defendant said he was going to leave the country, and inquired as to how much money a man should have to leave with. The defendant was arrested at the penitentiary, at Yuma, Arizona, where he was going by the name of Frank Woodson. Among his acquaintances generally he seems to have gone by the name of "Diamondfield Jack."

The theory of the defense seems to be that of an alibi. There was an effort to show that the defendant and Gleason left the Brown ranch late in the morning, the defense striving to have the hour of departure to appear as late as possible. Then the defense strove to have the time of the arrival of the defendant and Gleason at the Boar's Nest to appear as early after noon as possible. Then the defense strove to show that it was not probable that the ride from the Brown ranch to the Boar's Nest, by way of the place of killing, could be made by men riding the kind of horses the defendant and Gleason were riding between the time they left the Brown ranch and the time they arrived at the Boar's Nest. There was much expert testimony adduced showing the speed at which horses could be ridden in February, 1896, in that locality. The evidence of the witnesses on the part of the prosecution on this point differs materially from that of the defense, and the witnesses for the latter do not agree among themselves. The speed at which defendant and Gleason could have ridden their horses, at the time in question varies, according to the witnesses, from three to twelve miles an hour. But the jury after hearing all of the evidence and seeing the witnesses, and noting their manner of testifying, decided that the defendant and Gleason could and did ride from the Brown ranch to the Boar's Nest, by way of the place where the deceased was killed, on the fourth day of February, 1896, between sunrise and 3 o'clock in the afternoon, or in less time, and the said conclusion is justified by the evidence. No attempt is made to show the whereabouts of the defendant and his companion, Gleason, on that memorable day, during the time intervening from their departure from the Brown ranch to their arrival at the Boar's Nest. The defendant did not testify on the trial. His traveling companion, Gleason, who was not jointly indicted or informed against with him, did not testify.

No effort is made to show where they were at or about 9 o'clock of that morning. The jury—correctly, we think—concluded that the theory of the defense was not sustained by the evidence. The gist of the defense of alibi consists in showing that, at the time the crime was committed, the accused was at a place different from that where the crime occurred. Without showing that the defendant was at a different place when the crime of which he has been convicted occurred, the defense has endeavored to make it appear improbable that he was present at the time and place of the homicide in question. The verdict of the jury is sustained by the evidence.

The second error assigned by the defendant goes to the admissibility of the evidence showing that the defendant attacked the Dunn sheep camp on the night of February 2, 1896. For the reason that defendant was making war on a class of persons to which the said Dunns and the deceased belonged, and for the purpose of proving motive on the part of the defendant, the said evidence was clearly admissible.

The third error assigned by the defendant goes to the admissibility of threats made by him generally against sheepmen. Under the circumstances of this case, evidence of such threats was admissible, and the action of the trial court in admitting such evidence, and in refusing to strike it out, was proper. (See citation of authorities in State v. Larkins, 5 Idaho, 200, decided by this court, and reported in 47 Pac. 946.)

The fourth error relied upon by the defendant is not tenable. The witness Dayley testified that while he was acting as a guard or assistant to the sheriff, and while on the road conveying the accused from Yuma, Arizona, the accused being under arrest on the charge involved in this case, said accused, without request so to do, and without any promise or threats having been made to him, of his own volition, stated to said witness that he (the accused) was first told by Mr. Bower on February 6th, 7th, or 8th of the killing of Wilson and Cummings. Said declaration was admissible on two grounds: 1. It tended to show, especially when it is considered that the crime was not discovered until February 16th, about ten days after the alleged conversation with Bower, guilty knowledge on the part of the defendant;

and 2. It was contradictory of other statements made by the accused concerning the crime under consideration. It was not inadmissible because made to an officer who was in charge of the accused. No inducement was offered by said officer to the accused to get him to make the declaration. A confession or declaration tending to show guilt, made by an accused to an officer having him in custody, is admissible, if such confession or declaration was made freely and voluntarily, and without any inducement having been held out by the officer, or other person present, to the accused, by reason of which he is induced to make it, and there is no rule to the contrary laid down by this court in *State v. Mason,* 4 Idaho, 543, 43 Pac. 63, or in *State v. Crump,* 5 Idaho, 166, 47 Pac. 814.

The fifth, sixth, seventh, eighth, ninth, and tenth specifications of error are technical, and we think without merit. We think that all of the evidence sought to be excluded was competent; yet, if any of it was incompetent, we fail to see how it could affect any substantial right of the defendant. The defendant had a fair trial, was convicted, on sufficient evidence which pointed beyond reasonable doubt to the guilt of the defendant and his companion, Gleason, and excluded the probability of the crime having been committed by any other person or persons, and no error affecting the substantial rights of the defendant occurred during the trial.

As to the eleventh error specified, we think, after a full investigation, that the evidence disclosed by the affidavits on behalf of the defense is not such newly discovered evidence as entitled the defendant to a new trial. Said evidence is of the same character as that relied upon by the defendant, going to the improbability of persons riding from the Brown ranch to the place where the homicide occurred, and from there to the Boar's Nest, and from thence to the Middlestack's ranch, within the time that the defendant and Gleason must have made their ride on the 4th of February, 1896, and was to a great extent, at least, cumulative. Such evidence being in direct line with the whole theory of the defense, proper diligence required the defendant to produce such evidence at the trial. It was within his power to do so. A new trial was properly denied on this

ground. A new trial should never be granted on the ground of newly discovered evidence when such evidence is merely cumulative, nor when the alleged newly discovered evidence was easily within the reach of the defendant, and could, with reasonable diligence, have been produced at the trial. To grant a new trial on such grounds would not be subservient to the public good, but would, on the other hand, encourage a careless and loose presentation by the defendant of his 'defense.

The twelfth specification of error is based upon the fact that the defendant procured and filed affidavits of parties to the effect that three of the jurors, G. W. Gray, Stephen Mahony and George Moore, had made statements prior to the trial, to the effect that they were of the opinion that the defendant was guilty and should be hung. On *voir dire* examination each of these jurors stated that they had no opinion, and had never formed or expressed an opinion, as to the guilt or innocence of the defendant. The prosecution filed a number of affidavits of parties who have known the said jurors for years, and said affiants deposed that said jurors are men of high standing in the community where they live, and that the general reputation of each of said jurors for truth and veracity among their neighbors and acquaintances is good. The jurors Gray and Mahony each made an affidavit in which he denies making any declaration to the effect that the defendant was guilty, prior to the trial. The juror George Moore appears to have left the county after the trial, and his affidavit was not filed. The supreme court of California has held that such a declaration by an individual juror prior to the trial, and which is denied by him on his *voir dire* examination, is not misconduct of the jury, and is not cause for new trial on the ground of misconduct of the jury. The grounds for a new trial are statutory. The grounds for a new trial in a criminal case provided by our code are found in section 7952 of the Revised Statutes, which is as follows: "When a verdict has been rendered against the defendant the court may, upon his application, grant a new trial in the following cases only: 1. When the trial has been had in his absence, if the indictment is for felony; 2. When the jury has received any evidence out of court other than that resulting

from a view of the premises; 3. When the jury has separated without leave of the court after retiring to deliberate upon the verdict, or been guilty of any misconduct by which a fair and due consideration of the case has been prevented; 4. When the verdict has been decided by lot or by any means other than a fair expression of opinion on the part of all the jurors; 5. When the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial; 6. When the verdict is contrary to law or evidence; 7. When new evidence is discovered material to the defendant, and which he could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits the court may postpone the hearing of the motion for such length of time as, under all the circumstances of the case, may seem reasonable."

The alleged declarations of said jurors, respectively, prior to the trial, to the effect that they thought the defendant guilty, do not appear to come under either of the grounds provided in the said statute; but, if it be admitted that such declarations do come within the meaning of either of the grounds provided by the said statute, then the showing is not sufficient. When we consider that the affidavits tending to show such declarations are hearsay evidence, based on the recollection of the affiants as to what was said in a conversation that occurred months before the affidavit was made, and which conversation was probably not fully understood, or misunderstood, or perhaps not remembered correctly, we think the impeaching affidavits insufficient to overcome the positive statements of the jurors, strengthened by the testimony of divers witnesses showing good reputation for truth and veracity on the part of the jurors. Experience teaches us that the memory of man is a frail thing, We hear a statement to-day, and to-morrow, perhaps, are unable to recall it in the exact language of the declarant. Then, again, by failing to catch one word of a sentence, we get an idea

entirely different from that intended by the speaker. A simple
illustration of this may be made as follows: A, in speaking of
the accused, says: "If he is guilty, he should be hung." B,
standing by, fails to hear the first word, and naturally gets this
idea from what he hears the speaker say: "He is guilty; he
should be hung." A has said nothing whatever showing that
he entertains an opinion as to the guilt or innocence of the ac-
cused, although B honestly thinks he has. It becomes material
afterward to determine whether A had expressed an opinion as
to the guilt of the accused or not, and B testified that A did
express such opinion, while A testifies that he did not. A re-
peats the language that he used, while B says: "If he used the
word 'if,' I did not hear it." While the evidence of both A and
B is, technically speaking, negative, yet it is palpable that the
evidence of A is entitled to much more weight than that of
B. It would be a dangerous practice to establish the rule that
the verdict of a jury, which is fully sustained by the evi-
dence, should be set aside on the ground that one or two *ex parte*
affidavits are presented to the effect that one of the individual
jurors had expressed an opinion prior to the trial to the effect
that the accused is guilty, but which statement is denied by the
juror, who is proven to be a man of good reputation for truth
and veracity. In the absence of a statute providing such ground
for a new trial, the court is not authorized to provide it by rule.

In regard to the thirteenth specification of error, we are in-
clined to the opinion that the trial court had authority to cause
the witness Addie Gordon to be brought before it, and com-
pelled to testify; yet inasmuch as the statement which it is
claimed she would have made, would not, for the reasons here-
tofore given, entitle the defendant to a new trial, the refusal
of the trial court to cause said witness to appear before it did
not prejudice any substantial right of the defendant.

The fourteenth and fifteenth specifications of error question
the correctness of the action of the trial court in receiving and
considering affidavits offered by the prosecution to rebut the
affidavits offered by the defendant on the hearing of his motion
for new trial. While we think that such action is largely a
matter of discretion on the part of the trial court, yet, owing to

our conclusion that the showing made by the defendant did not, *prima facie,* entitle him to a new trial, it is not necessary to decide the correctness of the action of the trial court in receiving and considering such rebutting affidavits. A new trial was properly denied the defendant.

While a number of minor questions are raised by the able brief of the counsel for the defendant, which have not been specially noticed in this opinion, yet we have carefully considered all of them, and have specially noticed those questions that we deem necessary to consider to arrive at a correct conclusion in this case. The judgment and the order denying the defendant a new trial are affirmed.

Sullivan, C. J., and Huston, J., concur.

## ON REHEARING.

### (July 13, 1898.)

Per CURIAM.—The petition for rehearing, although quite voluminous, presents nothing new. No questions arising upon the evidence, or the law applicable thereto, which have not heretofore been fully considered and passed upon, appear in the petition; and, as we have already expended much time in a careful and laborious examination of the record and the briefs of counsel in this case, we are confident that a repetition of our labor would serve no other purpose than delay. Rehearing denied.