177 P.2d 474

### STATE v. KOTTHOFF.
### No. 7311.

Supreme Court of Idaho.
Feb. 13, 1947.

W. L. Dunn and Frank L. Stephan, both of Twin Falls, for appellant.

Robert Ailshie, Atty. Gen., and J. R. Smead, Asst. Atty. Gen., for respondent.

AILSHIE, Justice.

This is an appeal from a judgment of conviction for assault with intent to commit rape.

Appellant (Kotthoff), forty years of age, a discharged veteran of World War II, was employed by the Orange Transportation Company, as a truckdriver; he made three round trips from Twin Falls to Salt Lake City each week. According to the vice-president of the company, appellant bore a good reputation. He was "considered a good man". Another, when asked as to appellant's "being a law abiding citizen", said: "I have always found him so. * * * every one speaks highly of him." Mrs. Bright, owner of the apartment house where appellant lived, testified to his "good" reputation.

October 19, 1945, appellant (Kotthoff) and wife moved into an apartment in Twin Falls. November 19, 1945, Lorene Hann, prosecutrix, with her husband, moved into the same apartment house; they were married September 25, '45. Originally the house was a single residence property, converted by the owner, Mrs. Bright, into a two-apartment house. The two couples (Kotthoffs and Hanns) share a refrigerator, which was in the kitchen of the Hann apartment, a lavatory and bathroom connecting the two apartments. The two doors (inside of the bathroom), one leading from the Hann apartment and the other from the Kotthoff side, were equipped with locks. There were, however, no locks on the doors inside of the Hann apartment. After the latter couple moved into the house, appellant and wife had locks put on the doors inside of their apartment.

It was customary for appellant's wife to to go into the Hann kitchen to make use of the refrigerator, also to see about hot water which was heated by an incinerator there. When asked as to whether the latter resented that, appellant's wife replied: "She seemed to." In order to heat the bathroom for either couple, it was necessary to leave the door to each separate apartment open. A great deal of friction and some differences between the parties arose over the Hanns partying and making so much noise that appellant and his wife could not sleep. Mrs. Kotthoff testified to several "altercations" with the Hanns and had "asked them to be more quiet because we couldn't sleep". Complaint was also made because the bathroom door leading to the Kotthoff apartment was locked "half of the time * * * they [Hanns] consistently forgot to unlock the door so we could get in". The relations between the two couples were not friendly; they did not neighbor.

One "Saturday" night, soon after the Hanns moved into the apartment, they gave

a "housewarming" and neighbors complained on account of the noise, "a lot of car doors banging and music" until "two-thirty" in the morning. When asked whether there had been "some wild parties there", appellant's wife replied: "There had been one party" and "drinking before that." As to how the word reached Mrs. Bright, the owner of the house, Mrs. Kotthoff said she believed Mrs. Bright's "sister wrote to her." Mrs. Bright stated that the "neighbors" had told her.

November 30, 1945, less than two weeks after the Hanns moved into their apartment, a telegram (dayletter) was received by the Kotthoffs and three days later a letter followed, both sent them by Olen N. Sutton, Memphis, Tenn., apparently the agent for the owner, Mrs. Bright. On the day the letter was received, appellant delivered the telegram and letter to Mrs. Hann; he handed them to her in the kitchen of her apartment. According to testimony of the prosecutrix and appellant, this was the only time he had been in the Hann apartment, except for the time the two couple were introduced by Mrs. Bright. Prosecutrix accepted the telegram and letter but did not read or discuss them with appellant. They read as follows:

"KHA 17 DL PD—MEMPHIS TENN 30
858A

1945 NOV. 30 AM 8 23

Mr. and Mrs. Paul Kotthoff—

325 3 Av. West Twin Falls Ida.—
Mrs. Kutthoff, Letha writes that the Hanns are really wild, told by neighbors, and you are strictly in charge of house, you take the radio in your apt letter will follow to you for Hanns, carry out my orders you may act as Mgr, regards—

Olen Sutton"

"P. S. Ann show this letter to both Mr. and Mrs. Hann *Please*

Hotel Peabody
Memphis, Tennessee

*30*

Friday 9 A. M.

Hello Paul & Ann

I just sent you a 50 word day wire so here is the letter. I just had a letter from Letha, and she is quite worried about the other part of the house, as you folks know and Letha and I both thought, that Mr. and Mrs. Hann were such inocent kids, I want you & Paul to show them this letter. Letha & I both want you & Paul to stay, sort of look after the house, we will not have any late wild parties at no time in that house by them or no one else. You & Paul were there a month & you both were so quiet that one would hardly know you were there. I expect to have such conduct carried out. As to them having company that is fine, but not wild parties.

You know Ann I've known Letha all my life, and it is my duty to look after her intrests. She wrote me about it. Ann you & Paul take the big Radio and put it in your apt. we forgot it before we left, just cover it up with something *please.*

Now if Mr. & Mrs. Hann want to stay there they must obey you, if *now* we will ask you to rent the apt. to some good couple that you & Paul feel like you would like to have for your neighbor. Now we are not coming back. I'm glad we heard about this and orders must be obeyed. $10^{30}$ P. M. is late *no ink* (balance of letter written in pencil] enough for company to visit 11 p. m. at the latest and above all *respect has to be shown to all.*

Please write and tell me as Letha worries about things.

Best wishes & kindest regards to you & Paul

Olen N. Sutton Gen. Del.<br>Memphis, Tenn."

In telling of the alleged attack, prosecutrix testified appellant had tripped her or knocked her down on the bathroom floor and attempted to rape her, December 14, 1945, about the time she was expecting her husband home for lunch (1 to 1:30 p.m.). Appellant did not accomplish his purpose but prosecutrix testified to bruises on her elbows, knees and ankles. Her husband corroborated her testimony, and also Dr. Murphy, to whom she went about 4:30 the same afternoon. After the alleged attack, prosecutrix returned "to the kitchen to put the water on for the coffee." After her return to the apartment, she testified she "heard something that sounded like a door opening, and it frightened" her; she ran from the kitchen out the front door to her husband's place of business, but her husband had already left for home. Mr. Arnold, who worked at the same refrigeration plant with prosecutrix' husband, said Mrs. Hann "came in and stood around by the stove and was hysterical." It took him "ten or fifteen minutes to find out what was the matter"; she "Had no coat or hat on." As to statement made by prosecutrix to Arnold, this was improper and hearsay and made outside the presence of appellant. Arnold then went back to the Hann apartment and found Hann there; this was about 1:30 o'clock. "Around two o'clock", accompanied by her husband, prosecutrix called at the police station to see Gillette, chief of police. Following the talk with prosecutrix and husband, and accompanied by a patrolman and detective, Mr. Gillette with the Hanns went up to appellant's apartment. Appellant was then arrested and taken to the police station. There was no warrant for appellant's arrest, although appellant "demanded" one, according to Gillette. Neither did the chief have a warrant when placing appellant in a cell; and there had been no sworn deposition or complaint charging him with any offense when placed therein.

Police Officer Wiley, who accompanied Mr. Gillette to appellant's apartment, at the time of the latter's arrest, testified to examining appellant's feet (both at appellant's home and later at the police station) and observed "a scratch on the top of his left foot over the instep." Appellant "told me [Wiley] that morning handling freight at Burley he had dropped a box of freight

weighing three hundred pounds on his foot." Prosecutrix testified she had "stamped his feet and kicked his shins", when trying to "escape" from appellant; that she had been wearing "heeled shoes, about an inch high" at the time. Testimony was also introduced concerning *two* towels, one of which was supposedly used at the time of the attack. Gillette testified he had looked for the towel but had not found it; that he had "the mate to it" in his office. However, in prosecutrix' testimony, she related that "we had *a small guest towel* hanging on the door [bathroom], given to me as a wedding gift", indicating that there was only *one* of these towels. (Italics supplied.) At the time of appellant's arrest, on going through the community bathroom, on the way to appellant's apartment, Gillette testified to the "clean linoleum on the floor"; and, in answer to the question, whether he saw anything "unusual that would attract attention or notice", replied: "No sir, I didn't". Though slight, this would tend to rebut part of prosecutrix' testimony.

Mr. Gillette admitted on the witness stand that the questions asked by him of appellant, while in his office at the police station, were all concerning the alleged act as related by prosecutrix in her statements to Gillette. The state made objection to these questions and the objection was sustained by the court, saying: "It is purely argumentative." This ruling is clearly erroneous. There was "no typed statement and no word for word record made of the conversation" between Gillette and appellant. According to Gillette's testimony, appellant admitted an attack on prosecutrix, also that he had "made a serious mistake" and couldn't figure out why he had done it. However, on the witness stand, appellant denied all such testimony.

Immediately following the alleged attack by appellant, prosecutrix and her husband left their apartment and lived at her mother's house; they did not stay at the apartment the night of December 14th. Later they went back to get their clothing and belongings but did not live there again.

December 17, 1945, three days after the alleged attack, prosecutrix sent the following letter to Mrs. Bright:

"Twin Falls, Idaho

Dec. 17, 1945

Dear Mrs. Bright—

Kenney and I have the telegram and letter from Mr. Sutton in your behalf— no doubt you know all about it. But in case you don't know about the latest development, I am writing to you.

About ten minutes till one o'clock Friday I walked into the bathroom. Mr. Kuthoff's door was open, which is unusual, and it startled me. However, I told myself not to be foolish, and walked over to close it. As I reached out to close the door he came into the bathroom, completely naked, and attacked me. I ran for my door, but he pushed me in a corner and locked my door. Then we struggled—it was the most beast-

ly thing you can imagine. He threw me on the floor, and finally he tore my panties off of me. He would actually have raped me, but he came all over me, so he couldn't.

I know those people have poisoned your mind toward Kenney and I, but I am enclosing a clipping from the paper and hope you believe it. My lawyer hasn't asked Mrs. Kuthoff if she plans to move, yet, but I am asking you to see that she does. You can file an emergency complaint with the local board here and she will have to leave within 30 days.

You appeared to Kenny and I to be upstanding citizens. However, since you so evidently approve of the Kuthoff's and believe a pack of lies about us we don't know what to think. If you still don't ask them to move, we will draw our own conclusions.

Sincerely,

Mrs. Kenneth F. Hann"

The cause was called for trial before the court and jury at the January, 1946, term at Twin Falls. Verdict was returned by the jury, finding appellant guilty as charged, and he was sentenced to imprisonment in the state penitentiary for a term of one to fourteen years. Later, on motion of defendant, he was admitted to bail in the sum of $1,000, pending appeal to this court.

Eight errors are assigned by appellant directed to improbability of prosecutrix' testimony; the purported confession of appellant, and its admission in evidence; and error of the court in giving certain instructions, and refusal to give others requested by appellant.

■ It is clear to the writer of this opinion that the court erred in admitting in evidence to the jury the so-called confession made by appellant to the chief of police and the policeman, Wiley. When reduced to a final analysis, it all comes to this: The chief got his statement of the case from the prosecutrix in her own language and her own story of it. The chief simply used the same statements she had made, in the absence of appellant, and put them in interrogatory form to appellant, without even naming the offense with which he was charged or apprising him of the fact that anything he said would be used against him. In lieu thereof, the chief repeatedly said to him he was charged and "under arrest for suspicion of assault with intent to commit rape"; whereas, in fact he was being held without warrant or verified complaint.

On the contrary, the defendant had been awaked from sleep in his own home and placed under arrest without either a warrant or verified complaint. He was not advised of the nature or kind of offense with which he was charged but, on the other hand, he was required to dress and escorted directly to the jail, where he was incarcerated without right of counsel and without any charge being made against him, and, after he had been detained in the jail for more than an hour, he was taken to the office of the chief of police and there put

through a cross-examination, in effect dictated by prosecutrix (that is, interrogative form of statements made by the prosecutrix to the chief and in the absence of warrant of arrest or verified complaint, or even the name of the offense charged against him). This violates every known rule relating to the evidence of confession of a felony. Maki v. State, 18 Wyo. 481, 112 P. 334, 33 L.R.A.,N.S., 465.

In Maki v. State, supra, the supreme court of Wyoming, in a unanimous opinion, held:

"Accused while under arrest for homicide was taken before a coroner's inquest and asked whether he wanted to testify, but was not informed that he was not required to testify or warned that his evidence would be used against him, nor was he represented by counsel. *Held* that, in the absence of such information and caution, his evidence given at the inquest would be presumed to have been involuntary and inadmissible. * * *

"While the decisions are not in harmony as to the rights of one who is not under arrest for the crime under investigation at the time he gives his evidence before a coroner's jury as a witness, they are practically unanimous as to one who is under arrest and charged with the commission of the homicide at the time he is sworn and gives evidence before such jury. The person so under arrest and charged with the commission of the homicide, and who is without counsel, is entitled to be informed of his right to decline to be a witness, or to answer any question, and properly cautioned as essential elements in determining the voluntary character of his statements then and there made. He is physically restrained of his liberty. In that sense he is not free to do and act as he pleases, and there is a very natural presumption that this restraint extends to and affects his mind to the extent that he would not freely say or admit those things which might thereafter be used as evidence against him. This presumption is not, however, conclusive, but may be overcome if it be made to appear from the evidence that after being cautioned and informed as to his rights, the prisoner voluntarily submits himself to examination under oath. Until he is so informed and cautioned, the law does not recognize his mind to be sufficiently free from the impending peril of his situation so as to entitle his statements to admission as evidence against him. Not alone upon the question that they may be untrue, but that the mind must also be left free to act with knowledge of the possible consequences. Ashcraft v. Tennessee, 322 U.S. 143, 153, 64 S.Ct. 921, 88 L.Ed. 1192, 1199. For definition of "confessions", see 20 Am.Juris., sec. 478, p. 417; 16 C.J., § 1468, pp. 717, 718; 22 C.J.S., Criminal Law, § 817, pp. 1425, 1426.

The policeman, Wiley, was not even present when the prosecutrix made her statement to Gillette but came in during the course of the questioning by the chief and heard the recitation of his questions by the hearsay route.

■ The trial judge very properly heard this testimony *in the absence of the jury* but after doing so clearly committed error in permitting the state to repeat the testimony and allowing it to go to the jury. The statements made by the prosecutrix to the chief of police, in the absence of the defendant, were wholly erroneous and purely hearsay testimony; nor did it amount to an outcry immediately following the alleged assault. In other words, an assault of this kind must be immediately made known in some way by the prosecutrix.

■ The mere fact that a man technically assaults a woman by improper laying hands on her is no evidence of his intention to commit rape upon her and to employ all force necessary to accomplish his purpose. The fact that defendant asked prosecutrix to kiss him and thereupon attempted to do so is no evidence that he intended to use such force upon her as might be necessary to rape her. State v. Neil, 13 Idaho 539, 90 P. 860, 91 P. 318; State v. Bernhardt, 51 Idaho 134, 139, 3 P. 2d 537; People v. Dowell, 136 Mich. 306, 99 N.W. 23, 24. If such were the law, there would doubtless be thousands of instances where prosecutions might be made.

Indeed, the prosecutrix said she opened the door "to the bathroom about half an hour previous to this incident, * * * and Mr. Kotthoff was in the bathroom, [undressed] and he said 'Come right on in', and I thought he was as embarrassed as I was and slammed the door and went to the kitchen to continue cooking. He had neglected to lock our side of the door"; all of which would indicate that neither one took the matter very seriously and certainly would not indicate that he had an intent to commit a felony on the person of the prosecutrix.

In State v. Neil, 13 Idaho 539, 550, 90 P. 860, 863, 91 P. 318, this court announced the following rule, with reference to the proofs necessary to convict a defendant of the crime of assault with intent to commit rape, as follows: "In order to warrant a conviction of the crime of assault with intent to commit rape, the state must prove beyond a reasonable doubt every essential element of rape except the final consummation of the act. It must show beyond a reasonable doubt that the defendant made an assault upon the female, with intent to use such force as was necessary in order to have sexual intercourse with her, against her will and without her consent. When those facts are shown, the crime is complete, and a conviction is warranted." State v. Andreason, 44 Idaho 396, 399, 257 P. 370; see, also, State v. Whittinghill, Utah, 163 P.2d 342, 344; Hammond v. United States, 75 U.S.App.D.C. 397, 127 F.2d 752, 753; 52 C.J., § 40, Notes 26, 27, p. 1028.

■ The evidence is too voluminous to quote in detail. The foregoing statement in chronological order is enough to well suffice in illustrating the failure of corroboration of prosecutrix, or even to show

beyond a reasonable doubt that appellant had committed a felony or violated the person of prosecutrix.

█ An examination of the evidence and all the instructions satisfies us that the court erred in refusing to give defendant's instruction No. 1 covering the subject of confessions. Having admitted in evidence the statements of the prosecutrix made in the absence of defendant, and evidence of the prosecutor, Gillette, and officer, Wiley, as to what was said by defendant and Gillette (after defendant had been placed in jail for an hour without warrant or verified complaint), the court should have given an instruction, covering the admissibility of confessions, and stated the law on this subject. While defendant's requested instruction No. 1 was not clear and complete a statement as it might have been (Maki v. State, Wyo., supra), it was sufficient to call the subject to the attention of the court and to require a specific instruction thereon. However, as we heretofore said, the alleged confession should never have been allowed to go to the jury in this case. Otherwise, we find no substantial error in giving or rejection of instructions.

The judgment is reversed and the cause is remanded with authority to grant a new trial and, if a new trial is had, to exclude the evidence of the purported confession or admission of appellant, made while he was held in custody without warrant or verified complaint, and without being notified of his legal rights or having opportunity to consult with counsel.

HOLDEN and MILLER, JJ., concur.

GIVENS, Justice (dissenting).

The majority holds the trial court erred, in sustaining the State's objection to a question propounded by the defense on cross-examination of the Chief of Police at folio 238 as argumentative.

Appellant's assignments of error challenge only errors in folios 65-88, 193, 202, 353-358, 538-542, 555-556, 594. Thus, no assignment of error challenges this ruling.

The answer was already given, was not stricken and the context and further extended cross-examination disclose no prejudicial error and that the defense was in no way interfered with or restricted by the ruling.

"Q. This man then, the defendant, did tell you in detail that he had attacked this woman? A. Yes, he did.

"Q. I didn't hear you give that to your own, exact, to the prosecution, just how he told that. A. He told that in answer to my questions.

"Q. Tell us the words he used. A. I asked him if he tried to make love to Mrs. Hann in the bathroom, and he said 'I did'.

"Q. He said 'I did'? A. Yes.

"Q. Anything in that to detail any act? A. Leading up to that, I believe—if you want me to go ahead?

"Q. Let's state, were they question and answer? A. All right.

"Q. That was all he said? A. No.

"Q. So far they were in response to your questions? A. Only to that question.

"Q. That question was in the conversation; not detailing anything, was it? A. I don't know exactly what you want to know, Mr. Dunn.

"Q. I want to have it clear, Chief, so the Court and Jury will know. A. Yes sir.

"Q. You say you asked him if he didn't try to kiss this woman when he found her in the bathroom. A. Yes sir.

"Q. You say he said yes, he did? A. Yes.

"Q. What detail is there in any words he said there?

*   *   *   *   *   *

"Q. That would indicate the detail of the alleged act—

"Mr. Sweeley: The State objects—

"Q. (Continued) Wasn't anything said? What was the next thing that was said and who said it? A. I said to him 'Did she resist?' and he said 'Yes, she did'.

"Q. So that there was two questions you put to him and you received answers that didn't detail any of the alleged act.

"Mr. Sweeley: The State objects to the questions and answers.

"The Court: Yes, the objection will be sustained; it is purely argumentative.

"Q. What was thereafter said to him at any time that detailed any action on his part? A. Will you let me answer this question, Mr. Dunn?

"The Court: Answer it if you can.

"A. I asked him if he then wrastled her on the floor, and he said he did; I asked him if he tore her silk pants off, and he said he did.

"Q. And his answers were all either indicative or affirmative? A. No, I think the words used were 'Yes, I did', or something to that effect.

"Q. He never once in this conversation said 'I wrastled her down on the floor'? A. No; I asked him about that.

"Q. So far as this offence was charged, his words were—A. This man, at one point in the conversation, expressed a great regret at making the mistake he had made, and didn't know why he did that thing; he said, further 'I am a hard working man, and I don't drink, and I don't do such things, and I don't know why I did it'. That was voluntary on his part. * * *"

The point is inconsequential.

The majority condemns the statements made to the Chief of Police by the appellant about an hour after his arrest, which in turn took place about an hour and a half after the commission of the alleged offense, as a confession; interrogatory in form, and without the Chief of Police "even naming the offense with which he was charged or appraising him (appellant) of the fact that anything he said would be

used against him," although the majority immediately states—"In lieu thereof, the chief repeatedly said to him he was charged and 'under arrest for suspicion of assault with intent to commit rape'; whereas, in fact he was being held without warrant or verified complaint."

The distinction between a confession and an admission is clearly detailed in State v. Wilson, 51 Idaho 659, 668, 9 P.2d 497, 500, quoting from State v. Garney, 45 Idaho 768, 265 P. 668, 670: " * * * the difference (from an admission) being that a confession is an outright acknowledgment in express terms, by a party in a criminal case, that he is guilty of the crime charged, while an admission is a statement by the accused of facts pertinent to the issue from which guilt may be inferred and which tends toward proof of the ultimate fact of guilt."

The Chief of Police testified that shortly after 2 o'clock on the 14th day of December, the day of the alleged offense, which concededly occurred, if at all, between about 12 and 1:30, he went to appellant's place of residence and arrested him, "booking him and putting him in jail" and that between 3 and 4 o'clock of the same afternoon, he took the appellant from the cell in which he was incarcerated into his, the Chief's office, and there interrogated him.

"Q. The conversation, at the time you were talking with Mr. Kotthoff had you made any threat to him as, to induce him to talk?  A.  No sir, I did not.

"Q. Did you make any promise to him of any kind?  A.  No sir, I did not.

"Q. To induce him to talk?  Were his statements to you willingly made?

*     *     *     *     *     *

"Q. What had you said to him before he talked with you, what did you say to him about it?  A.  I explained to Mr. Kotthoff that he had been arrested and was booked on a serious charge involving a felony; that it was no pleasure to me to see a young man like him get into this sort of trouble. I told Mr. Kotthoff that from the investigation that I had made so far everything indicated that he had made a serious mistake, and further that he had been caught in the mistake that he made. I told Mr. Kotthoff that he would not do himself any special good to try to lie about what he had done, and at that point Mr. Kotthoff agreed that he had made a serious mistake."

Upon appellant's objections, the jury was then excused and the following cross-examination occurred in the absence of the jury:

"Q. Mr. Gillette, you say you told him that he wouldn't do himself any special good if he lied, and what had you told him prior to that, if anything, to indicate why he was under arrest?  A.  As I explained, I told him that he was under arrest on suspicion of a serious charge.

"Q. And did you tell him what that charge was?  A.  Yes, I did.

"Q. What did you tell him? A. I told him he was under arrest for suspicion of assault with intent to commit rape.

"Q. Did you tell him on whom? A. Yes.

"Q. Who did you say it was? A. Mrs. Hann.

"Q. You told him that? A. Yes.

"Q. And where did you tell him that? A. In my office.

"Q. And that was all said before you told him it wouldn't do any special good to lie. A. I explained to him what he was up against, yes sir.

"Q. And tell the Court just what you did in the way of explanation, what words you used and how you did that. A. Mr. Dunn, there was no typed statement and no word for word record made of the conversation. I have stated now just what I told him.

"Q. Is that all you told him? A. There was some conversation there, as I have stated, I said it was no pleasure to me or any officer to see a man, a young man like this get into such serious trouble. I told him he wasn't the first one had made such a mistake and that the investigation indicated he had made a serious mistake and had been caught at it.

"Q. And did you tell him he was guilty? A. No, I didn't tell him he was guilty. I told him it indicated, in my belief he was.

"Q. You told him you believed he was guilty? A. Yes, I did.

"Q. But up to the time that he said anything you had told him these various things, and then you finished that statement and conversation off by telling him it wasn't going to do him any special good to lie? A. Yes, I told him everything indicated that he had made a serious mistake and he wouldn't do himself any good to try to lie about it.

"Q. Then you stopped there? A. No, I didn't stop.

\* \* \* \* \* \*

"Q. Now then, after you got into the office, after you got him into your office, you and he were there alone? A. Yes, at that time.

"Q. And what was the first thing you said to him? A. I believe that I explained to him what he was charged with and what he was up against

"Q. That is hardly satisfactory, Chief, could you tell the Court the words that you said to him; how did you explain it; what words did you use? A. I said 'It is only fair that you know you are up against a serious charge; that you are booked on a charge of assault with intent to commit rape, and that is a serious matter, and it is no pleasure to me to see a young man like you in such serious trouble'. I think that is about the way I started off.

"Q. And you then, in that spirit and attitude, led him to understand, or cause him to understand, that you were being friendly to him and wanted to help him?

A. No, I didn't want to help him; I was not angry with him.

"Q. Did you tell him you wanted to help him? A. No.

"Q. Did you tell him you were sorry for him? A. No.

"Q. That it was a serious charge? A. That's right.

"Q. That it was no pleasure to you to have to press; did you tell him it was no pleasure to you to have to press the charge against him? A. No.

"Q. Explain what was said. A. I have explained. I said it was no pleasure to me to see a young man like him in serious trouble.

"Q. Did you say anything to him to cause him to believe you were going to help him to get out of that trouble? A. No, I didn't.

"Q. What did you tell him when you told him it wouldn't do any good to lie? A. I told him so far everything indicated he had made a serious mistake and that he had been caught at it, and it would not do any good to lie about it, I would rather he would tell me the truth about what he had done."

There was further extended cross-examination and examination of the Chief; however, at no time was there any evidence of any threats or any promises or any intimidation and the Chief testified there were none, which is not denied.

"A. No, I told him that he would be given all his rights and not be deprived of any of his rights. I know I told him that.

"Q. But you didn't tell him that he didn't have to tell you anything there if he didn't want to? A. I don't remember whether I used that wording or not; I generally do; on a formal statement I always do."

Toward the end of the conversation in the Chief's office, another police officer, Wiley, came in and corroborated the Chief to some extent; otherwise, no other person was present. In the presence of the jury, the Chief testified with regard to appellant's statements as follows:

"A. I asked Mr. Kotthoff how he got that fresh cut or mark on his instep, and he said that while he was loading a box on the dock on this last run a box dropped on his instep and made that cut. I asked Mr. Kotthoff if he had tried to make love to Mrs. Hann, and he said, yes, he did; and I asked what was said and he said she resisted him, and I asked if he threw her on the floor and he said he did; I asked if he reached up and tore her pants off, and he said he did; I asked if he completed the thing he started to do, and he said no, he didn't; I asked if he had spent himself or discharged before he had a chance to do that, and he said yes, he did; I asked if he picked up a towel and wiped her off, and he said no, he didn't; I asked if he observed the towel that fell down there,

and he said no; I asked him if he wiped her off with it, and he said not; I asked if she had ever flirted with him, and he said no, she hadn't; I asked him if she had ever made any pass at him or given him any reason to think he could become familiar with her, and he said no, she hadn't; and he stated this, I believe, 'I had heard some wild parties in their apartment'. At this point Mr. Wiley came into my office and sat down, and I turned to Mr. Wiley and I said 'Claude, this fellow has admitted this whole thing in detail, he has stated that Mrs. Hann told the truth, and he don't know why on earth he did it' and I turned to Mr. Kotthoff and said 'Is that true, Mr. Kotthoff?' and he said 'Yes, that is true'. That is about the substance of the conversation that went on in the office at that time."

It is true that at the time of appellant's arrest, and at the time statements were made by him to the Chief of Police in the jail, no warrant had been issued or complaint signed. He was incarcerated about 2:20 p. m. on the 14th day of December, 1945, and advised by the Chief that he did not then have a warrant. Appellant then came with the Chief and was placed in jail, thus the appellant knew there was no warrant and yet he was physically at least, effectively arrested and the arrest was legal.

Section 19-603, I.C.A.,[1] State v. Autheman, 47 Idaho 328, 274 P. 805, 62 A.L.R. 195. Formal complaint was made and warrant issued by the Magistrate the same day about an hour after the statements made in the Police Station. Such delay or the circumstances anent the statements constituted no error.

"1. Defendant could not complain that sheriff violated his duty in that he failed to bring defendant before committing magistrate without unnecessary delay, where it appeared that sheriff did not arrive in town with defendant until about 5:30 in the evening and that sheriff took defendant before a committing magistrate the next morning, *especially where defendant waived preliminary examination when taken before magistrate.* Code 1932, §§ 19-515, 19-615. (Emphasis ours.)

"2. Defendant could not complain of admission of confession on ground that arresting officer delayed in taking defendant before nearest committing magistrate, for purpose of obtaining the confession, where it was not claimed any 'third degree' methods were used to secure confession, defendant testified substantially to what he had confessed. Code 1932, §§ 19-515, 19-615.

"3. Complaint could not be made of admission of confession on ground that it had

---

[1] "A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant arrest a person:

\* \* \* \* \* \* \*

"3. When a felony has in fact been committed and he has reasonable cause

for believing the person arrested to have committed it.

"4. On a charge made, upon a reasonable cause, of the commission of a felony by the party arrested. \* \* \* \*" Section 19-603, I.C.A.

been extorted from defendant who possessed a very low order of intelligence, where it did not appear that defendant's confession was extorted, and defendant testified substantially to what he had confessed." State v. Behler, 65 Idaho 464, 146 P.2d 338.

The quoted syllabi, though not by the court, fairly reflect the gist of the opinion. Similar evidence by the defendant in open court could not be the basis for admissibility of extra judicial statements, because if the defendant admitted the details in open court, there would be no occasion to entertain the extra judicial statements, yet the above case held such extra judicial statements admissible. Appellant herein likewise waived preliminary examination. "* * *, and after a preliminary examination thereon before said Probate Judge had been waived * * *."

There is evidence that he was at the time of the arrest told the charge:

"Q. And did you tell him what that charge was? A. Yes, I did.

"Q. What did you tell him? A. I told him he was under arrest for suspicion of assault with intent to commit rape.

\* \* \* \* \* \*

"A. I said 'It is only fair that you know you are up against a serious charge; that you are booked on a charge of assault with intent to commit rape, and that is a serious matter, and it is no pleasure to me to see a young man like you in such serious trouble'. * * * *"

The cross-examination then covered not only other incidents, but a complete rehash of the circumstances of the statements made by appellant to the Chief of Police and questions propounded by the Chief, all of this being before the jury.

The appellant on the witness stand denied making the statements to the Chief in so far as they constituted any admissions and denied categorically that he had harmed or intended to harm or molest prosecutrix, or that he committed or attempted to commit the offense with which he was charged, but did not testify he was coerced, threatened or promised anything. Testimony of appellant:

"Q. And what was the substance of the conversation? A. He told me of the offense we have against you, and you are guilty of the crime.

"Q. Did he tell you that you were accused of any particular crime against any particular person? A. Yes sir, he did.

"Q. He told you that? A. Yes sir.

"Q. What did he tell you? 'A. He told me assault with attempted rape.

"Q. Against who? A. Mrs. Hann.

"Q. What did you say? A. I told him that I was not."

Admissions by the interrogatory method were approved by this court in State v. Jeanoes, 36 Idaho 810, 813, 213 P. 1017, and in State v. Andreason, 44 Idaho 396, 401, 257 P. 370.

Appellant was no callow, witless youth, as occasioned the reversal in State v. Ma-

son, 4 Idaho 543, 43 P. 63, but a man of mature years and of some worldly experience. The interpretation of State v. Mason, supra, in State v. Behler, supra, is in harmony with this dissent. The only authority cited in support of the condemnation of these admissions is Maki v. State, 18 Wyo. 481, 112 P. 334, 33 L.R.A.,N.S., 465, which held evidence given by an appellant at a coroner's inquest without being advised of his rights, presumptively involuntary and inadmissible; the applicability of this holding being weakened by State v. Rotolo, 39 Wyo. 181, 270 P. 665.

This court, considering the admissibility of statements of this kind, has declared the criterion to be whether the statements were voluntary and made free from threats, fear or coercion, but has not condemned such statements because made while under arrest and no recourse need be made to foreign authorities for the established law in this State.

" * * * A confession or declaration tending to show guilt, made by an accused to an officer having him in custody, is admissible, if such confession or declaration was made freely and voluntarily, and without any inducement having been held out by the officer, or other person present, to the accused, by reason of which he is induced to make it, and there is no rule to the contrary laid down by this court in State v. Mason [4 Idaho 543], 43 P. 63, or in State v. Crumps [5 Idaho 166], 47 P. 814."

State v. Davis, 6 Idaho 159, 173, 53 P. 678, 682.

"The mere fact that the accused is under arrest or in jail at the time his confession is made, is held not enough to affect its voluntary character. There must be something more, some inducement or threat held out to overcome his will. If the arrest of itself were duress sufficient to exclude confessions made thereafter, prosecuting officers would have to depend almost entirely on other evidence to secure convictions. Even the humanitarian theory of exclusion has not been carried to this extent." 18 L.R.A.,N.S., p. 796, note b. citing among voluminous authorities, State v. Ellington, 4 Idaho 529, 43 P. 60, and State v. Davis, supra.

An analytical comparison of appellant's statements with those considered in State v. Garney, supra, disclosed substantial similarity and in this case the court laid down this rule with regard to admissions or confessions: "In this particular case there is corroboration, in the way of a statement made by appellant to the sheriff, at a time when appellant was confined in jail awaiting trial on the charge preferred against him, that he wanted to plead guilty. The admission of this testimony is complained of, on the ground that no proper foundation was laid and that there was no showing that the statement was made voluntarily. Such a statement borders closely on a confession, but we are inclined to view

it as partaking more of an admission; the difference being that a confession is an outright acknowledgment in express terms, by a party in a criminal case, that he is guilty of the crime charged, while an admission is a statement by the accused of facts pertinent to the issue from which guilt may be inferred and which tends toward proof of the ultimate fact of guilt. State v. Stevens, 60 Mont. 390, 199 P. [256], 257; People v. Ferdinand, 194 Cal. 555, 229 P. 341. The rule requiring a showing that a confession was voluntary and without promise of immunity or reward does not apply to mere admissions. People v. Camperlingo, 69 Cal.App. 466, 231 P. 601; Wilson v. State, 17 Okl.Cr. 47, 183 P. 613. The admission of this testimony of the sheriff was primarily for the determination of the trial court, there is no suggestion that the statement was anything other than purely voluntary, and we are not disposed to hold its admission erroneous. State v. Andreason, 44 Idaho 396, 257 P. 370." State v. Garney, 45 Idaho 768, 265 P. 668, 670; State v. Wilson, 51 Idaho 659, 8 P.2d 497.

It will be noticed that the Chief of Police did not testify appellant confessed his guilt as a legal conclusion, but in answer to the questions, admitted the facts and circumstances which constituted the offense, thus, these clearly were admissions: "After appellant was taken into custody he made certain statements to the sheriff and other witnesses present and at the request of the sheriff wrote certain figures and names on blank sheets of paper. Over objection that they were not voluntarily made, these admissions and writings (as exemplars) were admitted in evidence. The record shows that the admissions and writings were voluntarily given, without coercion, promise of immunity, or offer of reward. However, the rule as to confessions does not apply and it was not necessary to warn appellant before making them that they would be used against him. State v. Garney, 45 Idaho 768, 774, 265 P. 668; State v. Wilson, 51 Idaho 659, 9 P.2d 497. Admissions are admissible as original evidence and it was not necessary to lay the foundation as for impeaching questions. 16 C.J. 626; State v. Garney, supra." State v. McDermott, 52 Idaho 602, 614, 17 P.2d 343, 348.

As to the occurrence, prosecutrix testified substantially as follows:

"Q. What took place; where did you first see him? A. In the bath room; I opened the door, our side wasn't locked, it has a lock on the inside, but I opened the door and he was there, and he said 'Come on in', and I thought he was as embarrassed as I was, and I slammed the door and left. I went in again about ten till one and the door to the Kotthoff apartment was wide open and I walked across the bath room to close it. Mr. Kotthoff stepped into the bath room and he was completely naked. He locked the door into our apartment, then he attempted to

kiss me. I turned my back to him and my face to the corner of our door and the side wall. We struggled; he attempted to force me to turn around; finally he took hold of my arms with my back to him; at that time I stamped his feet and kicked his shins, and tried to escape. I had on some shoes, heeled shoes, about an inch high. I was fully clothed, I had been up cooking dinner. I believe I tore loose from him and we struggled for quite a while, and finally he tripped me or threw me on the floor, I can't remember, but I remember being on the floor and he ripped my panties off. He attempted—he attempted to rape me, but he had an orgasm and couldn't contain him. The discharge struck me on my stomach and he took a small guest towel we had hanging on the door, it was given to me as a wedding gift, he took this towel and wiped me. He told me if I told anyone I would be sorry, and I was not to mention it to anyone. I kept trying to leave, and finally he allowed me to leave, but he kept insisting that I musn't tell anyone. I went to the kitchen to put the water on for the coffee, and while I was there I heard something that sounded like a door opening and it frightened me so that I ran from the kitchen out the front door to my husband's place of business. I was frightened when I returned to the apartment. My husband was not at his place of business, but Jack Arnold was there. At first I didn't tell him what had happened, but I was afraid something might happen to Kenny and tried to get him to go get Kenny; I knew my husband had gone home to eat. At first he didn't seem to be in any hurry, so I told him something about what had happened and he called a cab because there were no cars around the shop at that time. He went and got my husband and they came back where I was, then we went to the Police Station, my husband and I. We talked with Mr. Gillette and I gave him the panties Mr. Kotthoff tore off me, then we returned to the apartment on Third Avenue West about two-thirty or three. I noticed the bruises on my elbows and knees. The next morning I was scratched and bruised and very sore and I ached all across my back and some parts were turned black and blue."

The prosecutrix is corroborated by the abrasions and marks upon her body, which were first examined by Dr. Murphy, a physician of Twin Falls, about 4:30 p. m. the day the offense is charged to have been committed, and by her husband as having noticed them that evening. State v. Leavitt, 44 Idaho 739, 749, 260 P. 164. Dr. Murphy testified thus: "About four-thirty p. m. on December 14, 1945, I examined Mrs. Hann for any injuries she might have sustained. Both elbows were bruised, abrasion of skin on front part of the right arm, and on side of right knee, abrasion of skin on inside of left ankle." Also, the hysterical condition of prosecutrix between 1 and 2 o'clock, immediately after the alleged offense, as testified to by her husband's co-employee, Jack Arnold, and her husband,

and later by police officers; by the circumstances of the food which she was cooking for her husband's lunch at the time of the alleged offense being abandoned by her upon the stove and burned and ruined when she fled the premises after the attack—indicative of her distraught condition; by the abrasion, bruise or sore upon appellant's foot, testified to by police officers when he was arrested in his bare feet about 2:30 o'clock that afternoon, corroborating her statement she kicked appellant. His explanation that the abrasion had been occasioned by a box falling on his foot merely created a conflict in the evidence and it was for the jury to determine whether the wound indicated it had been made by the fall of such a large box, or from prosecutrix kicking him and stamping on his feet with high-heeled shoes— all relevant circumstances sufficiently corroborate the prosecutrix within legal requirements. State v. Vail, 47 Idaho 354, 275 P. 578.

Whether or not there was ill-will between appellant and his wife and the prosecutrix and her husband, and the extent of its effect, because of correspondence between appellant and his wife and the landlady, and the complaints of neighbors, were gone into at great length before the jury and they were in a better position to judge from the testimony than this court is from long range, not having seen the witnesses or observed their demeanor upon the witness stand. Heretofore it has been the rule in this State that the jury is the judge of facts and the weight to be given any particular evidence. State v. Marren, 17 Idaho 766, 787, 107 P. 993; State v. Bouchard, 27 Idaho 500, 149 P. 464; State v. Wilson, supra; State v. Brown, 53 Idaho 576, 26 P.2d 131.

Under the paragraph from State v. Neil, 13 Idaho 539, 90 P. 860, 91 P. 318, as to the quantum of proof required, the question is whether there is sufficient evidence to sustain the conflict, and the language of the dissent in State v. Trego, 25 Idaho 625, 650, 138 P. 1124, 1133, is pertinent and compelling: "* * * This court should not usurp the functions of the jury, and the jury have heard the evidence, and 12 men have returned their unanimous verdict of guilty, and the trial judge who heard all the evidence approved the verdict and pronounced judgment and sentence accordingly. There was a sharp conflict in the evidence in this case, as there always is in cases of this kind; but the jury evidently believed this young girl, who claims that her person has been outraged, and gave credence to the witness who corroborated her story. * * *" State v. Trego, supra, which enlightening and forceful statement of the law is amply supported by State v. Bouchard, supra, [27 Idaho 500, 149 P. 467]: "It is within the province of the court to say whether or not evidence is competent or admissible,

340

but its weight and credibility are primarily for the jury. There is no more justification for the court to assume the functions of the jury than there is for the jury to undertake to assume the duties of the court."

The determination of any conflict in the evidence is the prerogative of the jury. State v. Thomas, 47 Idaho 760, 765, 278 P. 773.

When the surrounding portions of the opinion in State v. Neil, supra, are considered, they establish that this case, if followed both in spirit and substance, demands affirmance of the conviction herein.

"When the defendant undertook such a course of conduct, he did so at his own risk, and he must now be judged not so much by what he says as by what he did— by his conduct then and there. If she had killed him under those circumstances, while he was thus pursuing his unlawful quest, it would have been justifiable homicide. If a man thus bereft of his moral instincts, and the duty he owes to those whom he should protect, seeks to gain an unwilling consent by arousing the passions of his victim, and thus avoid the penalties of the statute, he will have to do so without assaulting and outraging her physical person, else his intentions will be determined by the acts he commits.

"A large number of authorities are cited by counsel for appellant, to the effect that the state must show in such cases that the female 'showed the utmost reluctance and used the utmost resistance.' Devoy v. State, 122 Wis. 148, 99 N.W. 455. To our minds the trouble with a number of these authorities is that they reverse the order of the inquiry. They go about inquiring into the kind, character, and nature of the fight put up by the woman, rather than the nature of the assault and evidence and manifest purpose and intent of the assailant. For the purpose of reaching the conclusions announced in some of these cases, it is necessary to assume that, in the first place, a man has a right to approach a woman, lay hold on her person, take indecent liberties with her, and that, unless she 'kicks, bites, scratches, and screams' (People v. Morrison, 1 Park.Cr.R., N.Y., 625), to the 'utmost of her power and ability,' she will be deemed to have consented, and indeed to have invited the familiarity. Such is neither justice, law, nor sound reason. On the contrary, under the statute, a case might arise where a conviction could properly be had for assault with intent to commit rape, and still no personal encounter or contact have ever taken place. In fact, many such cases are reported. 23 Am. & Eng. Ency. of Law, 866, and notes; 1 McClain's Cr. Law, § 463; 10 Ency. of Ev. 607, and cases cited.

"In a prosecution on such a charge as this it is essential that the state prove every fact necessary to constitute rape, except penetration. What the assailant

really meant to do, however, and the manner in which he meant to accomplish his purpose—whether by persuasion, force, or fear—is a question of fact, to be determined by the jury, and an appellate court should not disturb their finding simply because there is a conflict of evidence, but only for a failure of evidence on which to rest that finding and verdict. 23 Am. & Eng. Ency. of Law, 2d Ed., 865. It is true that she must not have consented, because, if she did, there would be no offense; but, on the other hand, men should not be allowed, under the protection of law, to construe every indiscreet act or word of a woman into a consent to carnal knowledge, nor should they be allowed to indulge in presumptions against the virtue and chastity of women. Rather let the evil-minded man incur the risk and hazard of misjudging the opposite sex, and endeavoring to degrade them and destroy their peace and happiness. A little of this kind of law would go a long way with some of the brutes who unfortunately bear the names of men. There would be far less illicit intercourse if there were no assaults by the seducer in the first place, and the oftener he is brought to justice the less annoyance the community will suffer from the graver offenses toward which his conduct leads." State v. Neil, supra [13 Idaho 539, 90 P. 862].

The judgment should be affirmed.

BUDGE, C. J., concurs.

